THE PEOPLE OF PUERTO RICO, Plaintiff and Appellant, *v.* JOSÉ SOTO ZARAGOZA ET AL., Defendants and Appellees.

No. 10547.  Argued June 7, 1951.—Decided February 1, 1952.

*Víctor Gutiérrez Franqui,* Attorney General, *J. Rivera Barreras,* Fiscal of the Supreme Court, and *Frank Vizcarrondo Vivas,* Assistant Fiscal, for appellant. *Celestino Iriarte* and *F. Fernández Cuyar* for appellees.

MR. JUSTICE SNYDER delivered the opinion of the Court.

José Soto Zaragoza and Harry Lake Penn were convicted in the district court, San Juan Section, on a charge of possession of *bolita* materials in violation of § 4 of Act No. 220, Laws of Puerto Rico, 1948. They appealed to this Court from a judgment sentencing them to jail terms of two years and one year, respectively. Thereafter we granted their motion for permission to desist from the appeal. The defendants thereupon filed a motion in the lower court praying that the judgment be set aside on the ground that it was obtained by fraud. After hearing testimony by both sides on this issue, the lower court granted the motion. The case is here on appeal by the People from the order of the lower court setting aside the judgment.(¹)

I

One of the errors assigned by the People is in effect that the lower court committed manifest error in weighing the evidence on the motion to set aside the judgment. This assignment makes it necessary to summarize the pertinent evidence presented both at the trial and at the hearing on the motion.

### Testimony at the Trial

*Modesto Castro,* a detective, testified that on May 27, 1950 at 11 p. m. he was in the detective headquarters at stop 6½ on Fernández Juncos Avenue in San Juan with three men who had been arrested on a *bolita* charge. A young man arrived and inquired why the three men were under

---

(¹) See our opinion in 72 P.R.R. 385, pursuant to which we required Soto and Lake Penn to post bonds pending disposition of this case.

arrest. He asked the young man if he was "travelling" with them. The latter replied in the negative, stating that he was "travelling" with Soto. Sergeant Costas, who heard this conversation, told the witness and detective Quiñones to take a walk around the block.

Quiñones and the witness went down Fernández Juncos Avenue toward San Juan. When they got about 70 feet from the police station, they saw Soto and Lake Penn in the front seat of a Cadillac automobile with the light on inside the car. When they were 8 feet from the automobile, he saw that Soto had in his hands yellow papers with lists of numbers consisting of 3 digits "with units to the right". In order to be certain, he used a flashlight to see the materials Soto and Lake Penn had in their hands. When they approached the car, Lake Penn gave Soto other lists, and Soto put them together and threw them on the rear floor of the car. He told Quiñones to get these lists. Quiñones got into the rear of the car and picked up the lists. Lake Penn tried to start the car, but the witness turned off the switch, got into the car and drove it to the police station.

He searched Soto at the station and found certain documents in the right pocket of his jacket, which were thereafter introduced in evidence. He also found on Soto a considerable sum of money, which was thereafter stipulated as $1,937, which he returned to Soto. He identified 36 lists of numbers of 3 digits followed by a dash and other numbers as those he had seen in the hands of Soto and Lake Penn and which Soto had thrown on the rear floor of the car. These lists were thereafter admitted in evidence.

After the defendants were taken to the station, he and Quiñones searched the car but did not find any other *bolita* materials. They found some bottles of whiskey in the trunk of the car and some lottery tickets and inscriptions of horses in the glove compartment. The witness explained in detail how the game of *bolita* is played.

*Federico Quiñones*, a detective, corroborated the testimony of Castro up to the time they reached the Cadillac automobile. However, he testified that the defendants only had lottery lists and tickets in their hands when he and Castro accosted them. The witness then testified that Lake Penn drove the car to the police station, with Castro in the rear and the witness in the front. When they arrived at the station, the witness went upstairs to check the lottery lists to see if they contained *bolita* numbers. While he was doing this, detective Rivera Rosa called him to help search the car. When the witness got to the car, he opened the rear door and found *bolita* lists on the floor. He said, "Don't search any more, here is the evidence".

A sworn statement by Quiñones, which was in substance the same as Castro's testimony, was offered by the People to impeach Quiñones' testimony and was admitted in evidence without objection by the defendants. Quiñones explained that he had decided to correct the "errors" in his sworn statement because shortly after he made the statement his father and brother died and his sister became a patient in the insular insane asylum. At the request of the district attorney, Quiñones was placed in custody with a view to prosecution for perjury.

*Ramón Pérez Méndez*, the first witness for the defendants, testified that on the night in question he accompanied Soto and Lake Penn, Soto's chauffeur, when they went to the police station in Soto's car after they had heard of the arrest of Santos Lake, the half brother of Lake Penn. They parked 5 or 10 feet from the station. He asked Castro what the charge was against Santos. Castro did not answer but said "you are travelling with Chichí". Quiñones and Castro went toward the car with a flashlight and he went with them. Neither Soto nor Lake Penn had anything in his hands when Quiñones and Castro approached the car. The detectives opened the rear door and searched the car but they found nothing. Quiñones got in the rear and Castro in the front.

The witness tried to get in the car, but Castro told him not to do so and to go to the station. They drove the 10 feet to the station. Quiñones got out of the car and went up to an office where Sergeant Costas was.

Castro stayed in the car. Quiñones and two more detectives came down to the car. They began to search the car and Quiñones appeared with *bolita* pages which he had found in the rear of the car. Soto said, "They are going to put me in prison, the devils". Quiñones replied, "It is impossible for me to plant *bolita* numbers in your car as I do not know you." Soto then stated that they would pay dearly for this, that "you could not put me in jail in this manner." Neither Soto nor Lake Penn was searched before he went into the station.

*Harry Lake Penn* corroborated in substance the testimony of Pérez Méndez. He added that at the request of Castro he opened the trunk of the car after it was parked at the station. While Soto and he were taking cases of whiskey out of the trunk, detectives Quiñones, Luis Parrilla and Rivera Rosa came down from the station to search the car. Quiñones opened the back door of the car and said, "it is here, do not look anymore".

The police made an inventory of the cases of liquor in the trunk and the lottery tickets and horse inscriptions they found in the glove compartment and delivered them to him after he signed the inventory. A detective called a taxi for him in which he departed, carrying the whiskey, lottery tickets and horse inscriptions. Several hours later, at 3 a. m., Sergeant Costas accompanied by other detectives arrested him at Stop 15 in Santurce.

On cross-examination the witness testified that he had been Soto's chauffeur for 10 or 15 years, that Soto has many houses, that he does not know if Soto is engaged in any other business. The testimony of Lake Penn that he was permitted to depart from the station in a taxicab after Soto's arrest

was corroborated by the taxicab driver and by the records of the taxicab company.

In finding the defendants guilty and sentencing them to jail terms, the lower court said: "The Court believes the proof of the People, the testimony of Modesto Castro and of Federico Quiñones Padró, even though there are certain inconsistencies between the testimony given today before this Court and that given before the district attorney. However, these contradictions are not substantial. Substantially the witness corroborates the testimony of Modesto Castro. But even thus, the testimony of Modesto Castro is worthy of belief by this Court."

We turn now to the evidence adduced before the district court on the motion which was thereafter filed to set aside the judgment rendered at the trial on the ground that it was obtained by fraud. The theory of Soto and Lake Penn in filing the motion was that a number of *bolita* lists had been seized in the possession of Luis Santos Lake on May 27, 1950 and that some of them were planted that same night in Soto's automobile while it was parked near police headquarters.

*Testimony at Hearing on Motion to Set Aside Judgment*

*Luis Santos Lake* testified that he, Francisco Vázquez and one Muskus were arrested on May 27, 1950 at 9 p. m. on a *bolita* charge. The detectives found 3 packages of *bolita* collections in his possession. He then testified as to how he had obtained possession of the three packages. He worked for a *bolita* banker. His job was to collect lists of numbers from the banker's agents at regular intervals. In order to identify the agent from whom he obtained each list, a different code number or word was used for each agent. The number or word corresponding to each agent was written on each list collected from the agent. The lists collected from each agent were kept in a separate package.

The three packages found in his possession when he was

arrested were marked in the aforesaid manner. One was from Barrio Obrero and had the word "rio" on the back of each of its lists. The other two were from Loíza Street, and each list in these packages was marked "6" and "14", respectively. The "14" collection was peculiar in that the "14" looked like a "17" in each instance. The witness, Vázquez, and Muskus were taken to the police station at stop 6½ in San Juan and locked up in the bull pen. The 3 packages were put on a desk in the detective headquarters and he did not see them any more.

He was present at "some parts" of the trial of Soto and Lake Penn, which took place on June 30, 1950. He pleaded guilty on July 6, 1950. He was present at the trial of Vázquez and Muskus, which was held on July 13, 1950. When the "14" collection was presented in evidence at the latter trial, he noticed that the number of lists was considerably smaller than when it was seized in his possession. Originally, all three collections consisted of more or less the same number of lists.

He was shown the lists introduced in evidence by the People at the trial of Vázquez and Muskus. They consisted of 62 pages of the "6" collection, 57 pages of the "rio" collection, and only 11 pages of the "14" collection. He identified them as being the "6" and "rio" collections and part of the "14" collection seized in his possession on May 27. He was then shown 36 lists introduced in evidence by the People at the trial of Soto and Lake Penn. He stated that these 36 lists were part of the "14" collection seized in his possession when he was arrested. He was sure of this for two reasons. First, each of these 36 lists had on the back the same peculiarly written "14"—a "14" which looks like a "17"—which was always written on the back of every list in the "14" collection. Secondly, he remembered having himself played 15¢ on the number 101–CB with a bolitero named Pedrín Santiago, whose lists were a part of the "14" collection. And now, examining on the witness stand the two packages of

lists with "14" on the back of each list—the 11 lists used at the Vázquez trial and the 36 lists used at the trial of Soto —he finds a wager of 15¢ on 101–CB at the top of one of the 36 lists and no such wager in any of the 11 lists.([2])

On cross-examination he testified that on May 27, 1950 he was collecting *bolita* lists for Roberto Andújar. He does not know any other *bolitero*. He does not know what business Soto is engaged in, although his half brother is Soto's chauffeur. He has never heard Soto mentioned as a *bolitero* and has never collected *bolita* numbers for him. He went to see Lic. Jiménez Sicardó after the Vázquez trial and told him to find out if the lists in the case against the defendant had a "14" on the back thereof. He did this because his brother was involved in the matter. He knew that his brother and Soto had been arrested on a *bolita* charge on the same night he was arrested but he did not come to their trial to testify. He does not know the name of the agent for the "14" collection. The latter used to leave the collection for him under a garbage can near a green bar on Loíza Street. Although he did not count the number of lists in each collection, he could tell more or less how many there were in each list when he collected them.

On redirect examination he stated that Soto was arrested and put in the bull pen with him at midnight on May 27, 1950. He did not go to see Lic. Jiménez Sicardó until after the trial of Soto because he did not know what collections the government was going to present in evidence against Soto. Thereafter he went to see Lic. Jiménez Sicardó to tell him to see if the lists used against Soto were those seized on the witness.

On further cross-examination he stated that he did not believe that two *boliteros* could have the same identifying number on the back of their lists. On redirect examination

---

([2]) The witness explained that "CB" means "combined numbers"; i. e., the wager is for 5¢ each on 101, 110, 011.

he stated that he was the only person in charge of collecting the "14" collection for Andújar and that he collected all the "14" lists on May 27, 1950. The "14" agent did not write numbers for any banker other than Andújar.

*Lic. Gustavo Jiménez Sicardó* testified that after the trial of Soto and Lake Penn on June 30, 1950, Santos came to his office and told him that "To me the evidence introduced against Soto are the papers they seized on me." He went to court and saw the number which looked like a "17" on the back of each of the lists introduced in evidence against Soto. He told this to Santos, and the latter replied that they were his. He could not see the lists in the case against Santos as the latter had not yet been tried and the district attorney would not let him see them. Santos pleaded guilty on July 6. On July 13 Vázquez and Muskus were tried. Santos testified at their trial. Vázquez was convicted and Muskus was acquitted. At this trial the district attorney conceded that the same person had written the "14" which looked like a "17" on the lists introduced in evidence in both the Vázquez and the Soto cases. (This same concession had already been made at this hearing.)

He also became aware of an additional piece of evidence at the Vázquez trial. He explained that "limited numbers" are those which have a limit as to the amount which can be wagered thereon because they are "dream numbers", or for some other reason. Vázquez told him that a list of dream numbers which had been introduced in evidence against Soto was his and had been seized in his possession on the night of May 27. In addition, he heard Vázquez testify at the latter's trial that Sergeant Costas went into the office, took some of the papers which had been seized from Santos, and went towards Soto's car.

A few days later, after the trial of Soto and Lake Penn, the witness asked Santos if there were any other ways besides the peculiarly written "14" by which he could identify the lists of the "14" collection. After thinking a while, Santos

told him that he used to play 101–CB for 15¢ in the "14" collection and that such a wager must be on the "14" lists seized in his possession. The witness came to court and looked at the lists introduced at the trial of Vázquez. No such number appeared in these lists. He came to the Supreme Court where the Soto appeal was pending to look at the lists which had been introduced in the case against Soto and Lake Penn but was not permitted to see them as the exhibits were in sealed envelopes.

*Francisco Vázquez Ortiz* testified in the same manner as Santos as to their arrest, together with Muskus, on May 27, 1950 at 9 p. m. In addition, he stated that when he was searched the detectives found in his possession and took from him a yellow paper with printed numbers which came from a dream book. He was shown various papers which were presented in evidence against Soto at the trial of the latter. He selected from them a yellow paper and said it was the paper which had been seized in his possession. It was a series of numbers consisting of three digits but without units to the right. He used the paper "to look for dreams to play". It had no relation to *bolita* as such.

He, Muskus and Santos were put in the bull pen at police headquarters after they were arrested. About 11:45 p. m. Castro took the materials seized on Santos into the office of Costas and put them on a desk. Costas and Castro began to open them. They consisted of three packages of lists in a paper bag. They took the lists out of the packages and scattered them on the desk. From the bull pen he could see the entrance and he could also see outside. About midnight he saw a young man appear and ask for Santos. Castro asked the young man if he travelled with them. The latter replied that he was with Soto. Costas told Castro and Quiñones to take a walk. About 15 minutes later a large car arrived and parked in front of the station and directly in front of the bull pen, about 25 feet from the bull pen. Two persons dismounted. One of them, Quiñones, was carrying

a package of lottery tickets. He entered Costas' office and Parrilla and Rivera Rosa left the office.

While Quiñones was checking the lottery tickets, Costas took a handful of the lists which had been seized from Santos and which were scattered on the desk. He went outside with the lists in his closed fist, leaned on the right rear part of the car, and put the lists in the car. He then walked away from the car. He no longer had the lists in his hand. He called Quiñones to search the car. Quiñones descended and searched the rear of the car. Costas came back into the station.

A violent discussion then began between Soto, Lake Penn and the detectives. Before Costas went down the steps with the lists in his hand, the trunk of the car had been searched by detectives Castro, Rivera Rosa and Parrilla while Quiñones was examining the lottery tickets. About 15 minutes later Castro and Costas put Soto in the bull pen with them. Costas told Lake Penn to take away the cases of whiskey they found in the car. Costas told Lake Penn he could leave and he left in a taxi, taking the cases and the lottery tickets, which were returned to Lake Penn. Soto was not searched personally. He saw Lake Penn later in the morning in jail.

On cross-examination he stated that he did not know in what business Soto and Lake Penn were engaged. He told the story about Costas taking the lists and putting them in the car for the first time on October 11, 1950 to Lic. Jiménez Sicardó. He has served two sentences on *bolita* charges and is now a *público* chauffeur.

*Ramón Rivera Vizcarrondo* testified that two or three days before May 27, 1950 he was in the district court waiting to serve as a juror. Costas arrived with some *boliteros* he had arrested. He heard Costas say, "I caught this small fry and I am going to catch Chichí with or without a collection".[3] He went to see his friend Soto and told him what

---

[3] The witnesses frequently refer to Soto throughout their testimony as "Chichí".

Costas had said. At that point the district attorney stated, "At this time I request that Sergeant Costas be summoned. A charge has been made against this officer and it is logical that he defend himself." The court thereupon directed that Costas be summoned to appear the next morning.

*José Soto Zaragoza* testified that on the night in question his car was searched in front of the station by Quiñones and Castro. The inside light was on and the detectives searched the rear of the car with a flashlight but found nothing. Quiñones went up into the station with some lottery tickets which had been seized from the witness while the latter had them in his hands.

Castro took the key away from Lake Penn and he and Parrilla went to search the trunk. They could not open the trunk and called Lake Penn to open it. The latter did and some cases of whiskey were found in the trunk. Castro ordered Lake Penn to take them out. "While this was being done, Sergeant Costas passed and leaned on the rear door of the car with his right arm inside the car and looking back toward us. As the car had been searched twice by Parrilla, Rivera and Castro, I gave this no importance. He went upstairs and as he went up detective Quiñones came and directing himself toward us with some papers in his hands, he said: 'Don't look any more, here it is'. I said, 'Look you bandit, how can you say that is here? You put that here yourself' ".

Quiñones and Parrilla then went up into the station and they went to the rear with Costas. They left him and Lake Penn in front of the station. About 20 minutes later Costas and Castro came out and put him in the bull pen with Santos, Vázquez and Muskus. Lake Penn was not arrested and he left in a taxi with the cases of whiskey and the lottery tickets. Three or four hours later they arrested Lake Penn. The witness was not searched at the station, but was searched at the jail, where nothing was found in his possession except $1,937 in cash. He had never before seen the *bolita* lists

which were presented in evidence at the trial against him. He explained the nature of several other documents presented in evidence at the trial by the People, which we find it unnecessary to summarize.

On cross-examination he explained how *bolita* is played. He was in the *bolita* business until May 3, 1949, when detective Virella "framed him." On that occasion he was searched in the street and nothing was found on him. He was searched later at the station and a paper was found in his pocket. He explained again the nature of the documents which we have not described in detail. He knew what Rivera Vizcarrondo had told him before he was tried on June 30, 1950, but he learned about the coincidence as to the two groups of lists for the first time after his trial.

On redirect examination he testified that he went to the station to obtain a bond for a brother of Lake Penn. When asked if he had *bolita* lists with him at that time, he replied, "How could I go in front of the station with *bolita* lists!" From his previous experiences with *bolita*, he knows that two collectors could not use the same number "14". He explained how he was robbed on one occasion and this caused him to require thereafter that each collector be identified by a number. - "It is the same with 14". A collector works only with one banker and 14 could therefore be the number of only one collector. If there were another collector using "14", he would be a collector for another banker; otherwise, mistakes would be made in paying the prizes.

*Sergeant Luis V. Costas* was the only witness for the People. He testified that he had never spoken to Rivera Vizcarrondo, whom he knew by sight, on May 27, 1950 or on any previous occasion in connection with *bolita* or anything else. The record of the evidence taken at the trial of Soto and Lake Penn was also introduced in evidence.

Thereafter the district court entered an order setting aside the judgment sentencing the defendants to jail on the ground that it was obtained by fraud. The lower court

based this order on its findings of fact that the lists of *bolita* numbers allegedly found in Soto's automobile on the night of May 27, 1950 had in fact been seized in the possession of other persons who were arrested on the same night for the same crime; that these lists were thereafter "fragmented or separated"; and that part of them were then "introduced" into Soto's automobile in order to make it seem that they had been seized in the automobile.

In arguing that the lower court committed manifest error in weighing the evidence on which it based its findings of fact, the *Fiscal* of this Court emphasizes two points: (1) certain discrepancies in the testimony at the two hearings; (2) the witnesses who testified that they saw Costas deliberately plant *bolita* lists which had been seized in the possession of Santos in Soto's automobile were confessed *boliteros* and were undoubtedly lying as to certain matters; for example, that they had never known Soto by reputation as a *bolitero*.

Both of these points might in the ordinary case be quite persuasive to the trier of the facts. As the *Fiscal* points out, there was a conflict in the testimony of various witnesses on several matters: (1) whether the automobile was parked in front of the station or 70 feet away when the detectives first approached it; (2) whether the defendants had *bolita* materials, lottery tickets, or nothing in their hands at that time; (3) who drove the car to the station from the place where it was originally parked. In the ordinary case these discrepancies, which are apparent from our summary of the evidence, might have considerable bearing on the general credibility of the witnesses in question. In the same way, the criminal records of the principal witnesses for the defendants, the blood relationship of one of them to Lake Penn, and the fact that they were obviously lying in parts of their testimony would ordinarily cast doubt on their credibility. But here the overriding consideration, which undoubtedly persuaded the lower court that the *boliteros* and not the

detectives had told the truth *as to the principal facts in controversy*, was the documentary evidence.

It cannot be reasonably disputed that the lists introduced in evidence against Soto and Lake Penn were a part of the "14" collection which was picked up by Santos on the night of May 27 from the agent for the "14" collection. Once that is conceded, it is difficult to see how the "14" collection could have been seized on the same night in two separate parts in the hands of Santos and in Soto's car, respectively. On the contrary, in the absence of a plausible explanation to the contrary, it is logical to assume that once Santos received the "14" collection from the agent, when arrested he would either still have it intact or would have turned the entire collection over to the banker. But both parties agree that Santos was in possession of at least a part of the "14" collection when he was arrested. The conclusion is therefore almost irresistible that he had the entire collection with him at that time. And the fact that some of the lists thereafter somehow disappeared from the custody of the detectives and found their way into Soto's car parked near the station is highly corroborative of the oral testimony that these lists were planted in Soto's car.

Although not as convincing as the foregoing, three pieces of evidence lend some support to the appellees' theory. The first is that a list of "dream numbers" was admittedly among the documents introduced in evidence against Soto. Yet Vázquez testified that the list belonged to him and had been in his possession when he was arrested with Santos. The second is that a wager of "CB 101 for 15¢" is contained in one of the lists introduced in evidence against Soto. But Santos testified that he had made precisely this wager and that it was included in the "14" collection. The third is that Santos testified that the three collections contained more or less the same number of lists. And, as we have seen, the 36 lists from the "14" collection introduced at Soto's trial plus the 11 lists from the same collection introduced at Váz-

quez' trial approximate the number of lists in the "rio" and the "6" collections, respectively.

While not too significant in themselves, two other episodes of a negative character also tend to confirm the theory that a scheme to frame Soto was perpetrated. The detectives failed to seize the $1,937 in his possession; they also failed to arrest Lake Penn at the scene of the alleged crime. If they had actually apprehended Soto and Lake Penn handling *bolita* materials in the former's automobile near police headquarters, they would have probably impounded the money for possible confiscation in connection with the *bolita* charge. And they would also have probably arrested Lake Penn immediately instead of arresting Soto and releasing Lake Penn and then arresting the latter several hours later when it belatedly occurred to them that his release was inconsistent with their trumped-up story that Soto and Lake Penn had been handling *bolita* materials *together*. These two omissions by the detectives, when considered in the light of all the other evidence in the case, seem to indicate that the mind of the ring-leader was focused so intensely on the scheme to frame Soto that he overlooked two obvious steps he should have taken to avoid the charge that the evidence against Soto had been contrived.

It should be added that Soto testified that he had been a *bolita* banker. The police were aware of this and were attempting to apprehend him. Cf. *People* v. *Soto*, 71 P.R.R. 776. It therefore seems hardly likely that he would park near police headquarters—whether 10 or 70 feet away—and proceed to handle *bolita* lists with this chauffeur.

At first blush it seems dubious that a police officer would engage in such a crude and flagrant frame-up in full view of the occupants of the bull pen. But it may be that Costas was not aware that they could see him or were watching him. In addition, he obviously did not know that the lists he was planting in Soto's car could be unmistakably traced to the "14" collection originally obtained by Santos from the

agent. He might therefore have thought that it would be only a question of his word against the word of *boliteros*. Under those circumstances, he was perhaps confident that the district court would not believe the oral testimony of *boliteros* that the lists had been planted in Soto's car, especially as this is a favorite, although usually false, defense presented by defendants charged with possession of such things as *bolita* materials and narcotic drugs. In any event, whatever Costas' reasoning might have been, we cannot ignore the highly significant documentary evidence merely because the conduct attributed to Costas was not only corrupt but also foolhardy. In this connection, we think it is significant that Costas never denied the story that he planted *bolita* lists in Soto's car, in spite of the fact that he took the stand to deny the comparatively trivial charge that he once threatened to arrest Soto "with or without a collection".

The *Fiscal* of this Court argues that when Soto in his testimony explained why the number "14" was placed on the back of the lists for a particular collection and why "14" would not be used by any other agent of the same banker, he in effect admitted that this collection was made for him as a banker. We do not so interpret his testimony. As we read it, he was indicating in a general way why he and other bankers decided to avoid problems as to payment of prizes by identifying each collection with a code number. But even if we assume that Soto practically admitted that the collection was for him and that Santos was lying when he testified it was for Andújar, we fail to see how that helps the government's case.

Soto was not tried on the charge of operating a *bolita* bank. He was accused of possession of certain *bolita* lists. In its conclusions of fact the district court found that Santos, and not Soto, had been in possession of these lists and that they were thereafter planted in Soto's car. If we accept those findings, it is immaterial, for purposes of this

case, whether Santos collected these lists for banker Andújar or banker Soto. If Soto is a banker, he should be charged, tried, convicted and punished for that offense. But if we accept the findings of fact that the lists in question were seized in Santos' possession and planted in Soto's car, we cannot permit a judgment of conviction on a charge of possession to stand, merely because an inference might conceivably be drawn from the record that Santos was in possession as an employee of Soto. Under those circumstances, the fraud vitiated the judgment rendered on a charge of possession irrespective of Soto's guilt or innocence of the different charge—operation of a *bolita* bank—which has not been brought against him.

As noted in our summary of the evidence, certain documents other than the lists from the "14" collection were introduced in evidence at the trial of the appellees. However, unlike the *bolita* lists allegedly found in Soto's car, these other documents are not typical *bolita* materials such as those found in *People* v. *Mantilla*, 71 P.R.R. 35, 49, and in *People* v. *Acevedo*, 70 P.R.R. 534. Since they are not *prima facie* incriminatory, we find it unnecessary to examine in detail the testimony of Soto on cross-examination that they concerned his racing and night club businesses. It is enough to say that there is nothing in the record to show affirmatively, either on the face of the documents or any evidence explaining them, that these other documents were *bolita* materials. We reach the same conclusion with reference to the only remaining document introduced in evidence at the trial of Soto and Lake Penn; namely, the printed list of "dream numbers" which consisted of three numbers *without* digits to the right. Apart from the fact that Vázquez testified—and the lower court apparently believed—that this list was his and was seized from him, it consists merely of several rows of three digit numbers with a heading which was partly torn away, with the remaining portion reading ". . . ed to $4.00".

We think the foregoing analysis makes it clear why we are unable to say, particularly in the face of the objective, physical facts disclosed by the documentary evidence, that the lower court committed manifest error in its findings of fact that the *bolita* lists allegedly found in Soto's automobile were actually planted there after they were seized in the possession of Santos.

■ The evidence adduced in support of a motion in a criminal case to set aside a judgment on the ground that it was obtained by fraud must establish facts which if known at the time of the trial would probably have prevented a conviction. *People* v. *Gerena*, 72 P.R.R. 211, 223; *People* v. *Adamson*, 210 P. 2d 13, 15 (Cal., 1949) ; *People* v. *Shorts*, 197 P. 2d 330, 333 (Cal., 1948) ; *Brown* v. *State*, 35 S. 2d 518, 519 (Ala., 1948) ; *Anderson* v. *Buchanan*, 168 S.W.2d 48, 53 (Ky., 1943) ; *State* v. *Gentry*, 62 N.E.2d 860, 862 (Ind., 1945) ; 59 Yale L.J. 786, 788. There can be no question that the testimony here meets this requirement. In fact, the *Fiscal* conceded this point at the oral argument. His only argument, which we have rejected, was that the lower court committed manifest error in giving credence to this testimony.

Finally, we have held that a defendant has a heavy burden where as here he attacks a judgment on the ground that it was fraudulently obtained. *People* v. *Méndez*, 67 P.R.R. 777, 781–82; *People* v. *Gerena, supra*, p. 216. But, accepting as we have the findings of fact in this case, it is obvious that these facts meet the test laid down in the cases; i.e., that this was not simply a case of government witnesses who might have perjured themselves, but a deliberately planned and carefully executed scheme to defraud the district court.

## II

■ A judgment may not be set aside on the ground that it was obtained by fraud unless the moving party satisfied the trial court that he could not have discovered the evi-

dence of fraud by reasonable diligence prior to entry of the judgment. *People* v. *Méndez, supra,* p. 781; *People* v. *Gerena, supra,* p. 216. The People argue that the appellees did not comply with this requirement and that Soto knew or could have discovered without difficulty the evidence in question prior to the judgment.

We agree with the *Fiscal* of this Court that Soto knew he had been framed prior to his trial. Indeed, the moment the detectives asserted they had found *bolita* lists in his car he undoubtedly realized what had occurred. But to know you are innocent and have been framed is a far cry from being able to prove it. In a somewhat similar situation we have held that such subjective knowledge, without proof thereof, does not bar a motion to set aside a judgment when the testimony in support of the motion was obtained after the judgment was entered. *People* v. *Gerena, supra,* p. 222.

The lists allegedly found in Soto's car were not produced until he was tried on June 30, 1950. Even at that time, although he knew they did not belong to him, he had no way of knowing, according to his testimony, that they belonged to Santos. It was only after he had been convicted and sentenced that Santos, who had been present at part of his trial, went to Lic. Jiménez Sicardó with his suspicion that the lists were part of those seized on Santos. And Vázquez did not reveal his knowledge of the frame-up until his case was tried. Presumably he preferred in his own interest to wait until his own trial to tell such an incriminatory story against the detectives.

Soto could have testified at his trial that he had seen Costas leaning on his car. And he could have summoned Rivera Vizcarrondo at the trial, instead of waiting to produce him at the hearing on the motion, to testify as to the threat Costas allegedly made to arrest Soto "with or without a collection". But we could scarcely say that these two episodes would be sufficient to support a frame-up charge. The important and decisive proof, particularly the docu-

mentary evidence, was not discovered until after the trial and judgment.   Indeed, if it had not been for the peculiarly written "14", Santos and Vázquez might never have talked and the frame-up might never have been exposed.

Even the *Fiscal* of this Court does not contend that after Santos came to Lic. Jiménez Sicardó with his suspicions, Soto was not diligent.   He made several unsuccessful efforts to obtain relief in the lower court.   Thereafter, as the case by that time was pending on appeal in this Court, Soto and Lake Penn voluntarily desisted from their appeal, stating that they were doing so in order to file the motion herein in the district court to set aside the judgment on the ground that it had been obtained by fraud.   See *People* v. *Méndez, supra*, p. 781, n. 1.

Whether the evidence of fraud was discovered subsequent to judgment is a question of fact.   The lower court apparently believed the testimony of the witnesses of the appellees as to when the evidence of fraud was discovered.   Here again we cannot say that this was manifest error.   And once we accept this testimony, it is apparent that the appellees complied with the requirement that they must show they could not have discovered the evidence of fraud by reasonable diligence prior to entry of the judgment.   *People* v. *Méndez, supra; People* v. *Gerena, supra; People* v. *Adamson, supra*, p. 16; *People* v. *Shorts, supra*, p. 336.

### III

The third assignment is that Judge Ramírez Pabón erred in conducting the hearing on the motion in view of the fact that Judge Torres Aguiar, who presided at the trial, was available for the hearing on the motion.

We agree that as a general rule the judge who tried a case originally, if available, should hear a motion to set aside the judgment rendered therein, as he is in a better position than any other judge to determine the truth..   But there was no showing that Judge Torres Aguiar was available.   On

the contrary, we take judicial notice that he sits regularly in the Humacao Section of the District Court and that he sat at the trial of Soto and Lake Penn in the San Juan Section by assignment. When the motion to set aside the judgment was filed, it came up in due course for hearing before Judge Ramírez Pabón, a regular judge of the San Juan Section. At that time the government was entitled to take whatever steps were necessary to have Judge Torres Aguiar assigned to hear the motion. It took no such action. Instead it now asserts for the first time on appeal that Judge Torres Aguiar rather than Judge Ramírez Pabón should have heard the motion. This contention comes too late. The People waived whatever rights it had to a hearing by Judge Torres Aguiar by failing to take appropriate action for his assignment. *Cf. State* v. *Gentry, supra; Bolton* v. *State,* 60 N.E.2d 742 (Ind., 1945).

## IV

The fourth assignment is that the appellees were not entitled to file their motion to set aside the judgment without prior permission by this Court. The government argues that the judgment has been affirmed; that the motion is designed to set aside our mandate directing execution of the judgment; and therefore that such action cannot be taken without our permission.

Aside from the fact that we did not affirm the judgment as Soto and Lake Penn voluntarily desisted from their appeal, the People's contention misconceives the purpose of this motion. It is not directly concerned with our mandate. Rather it alleges that fraud was practiced on the district court. And we have held that under such allegations the lower court should pass on the issue in the first instance. *People* v. *Méndez, supra,* p. 781. In entertaining the motion the district court therefore did not flout our authority. On the contrary, it properly exercised authority necessarily vested in it to set aside as void a judgment obtained by fraud

which was practised on the lower court itself. Some cases do hold that under these circumstances permission of the appellate court is required. But the weight of authority, with which we agree, is that no such permission is necessary. Annotations, 146 A.L.R. 1230, 145 A.L.R. 818; Note, 59 Yale L.J. 786, 788. The cases relied on by the government—*Taylor* v. *Alabama*, 335 U. S. 252, and *Hysler* v. *Florida*, 315 U. S. 411—have no bearing here. They merely reject the contention of a defendant that a statute or case *requiring* such permission violates due process of law.

The *Fiscal* of this Court also argues under this assignment that the only remedy of the appellees was to file a petition for habeas corpus and to show that the district attorney *knowingly* made use of the perjured testimony of a material witness. The cases hold that such unscrupulous conduct by the district attorney is a denial of due process of law and warrants release by habeas corpus. *Mooney* v. *Holohan*, 294 U. S. 103; *Hysler* v. *Florida, supra*, p. 413; *Pyle* v. *Kansas*, 317 U. S. 213, 216; *White* v. *Ragen*, 324 U. S. 760, 764. But those cases have nothing to do with our problem. Here the district attorney did not deliberately produce perjured testimony. So far as the latter knew, the facts were as the lower court found them at the original trial. No constitutional issue involving lack of due process could therefore be raised in this case. Rather the appellees contend that there was a scheme by others who did not simply perjure themselves but engaged in a deliberately planned and carefully executed scheme to defraud the district court. Under those circumstances they were entitled to file a motion within the original case alleging these facts. *People* v. *Gerena, supra; People* v. *Adamson, supra*, p. 16.

We add a final word with reference to the implications of this case. *Bolita* is a serious evil in Puerto Rico, and the authorities deserve commendation for their vigorous efforts to stamp it out. See *People* v. *Mantilla, supra*, p. 46. Moreover, in his own testimony Soto demonstrated that he is a

highly unsavory character and that he has played a leading role in the harm inflicted upon this community from the operation of *bolita* games. We have no doubt that if he continues his nefarious practices, he will in time be apprehended and punished.

However, there is much more at stake here than the guilt or innocence of a particular individual. This was a scheme in which only one police officer and a subordinate or two participated. But in doing so they attempted to strike a vital blow at the heart of our democratic institutions. Today such a plot may involve a guilty man. The next step would be to frame the innocent. We are confident that appropriate steps will be taken to prevent the repetition of such pernicious practices. See *Hazel-Atlas Co.* v. *Hartford Co.*, 322 U. S. 238, 246.

The order of the district court setting aside the judgment sentencing Soto and Lake Penn to jail terms on the ground that it was obtained by fraud will be affirmed.

---

MR. CHIEF JUSTICE TODD, JR., concurring.

Even though I concur in full with the opinion of the Court, I find it imperative to make a few remarks on the reasonings and conclusions set forth in the dissenting opinion of Mr. Justice Negrón Fernández.

This Court confines itself in this case to applying the well known and oft repeated rule that it shall not interfere with the weighing of the evidence by a lower court unless there is a showing of manifest error, passion, prejudice or partiality. No authority is cited to hold that we should alter said rule here and decide the case according to our personal weighing of the evidence. The issue being thus narrowed, after an impartial analysis of the evidence before the lower court, and without speculating nor forcing implications not necessarily supported by said evidence, we reach the conclusion that said

court did not commit manifest error in weighing the same.[1] The fact that said conclusion necessarily involves responsibility under the law, for public officers who fail to perform their duty, can not hinder, either this Court or the trial court, from thoroughly performing theirs.

I believe that the implications derived and the conclusions reached in the dissenting opinion reflect, of course, its writer's personal weighing of the evidence and, had the lower court arrived at those same conclusions throughout the same reasonings and implications, we would probably have refrained from interfering with its views. However, we are not called upon to act as a court of first instance and in the face of the conclusions reached by the court *a quo*—supported by the evidence—to provide our own conclusions and deductions and to make them prevail. Such has never been the calling of this Court.

Now, and passing on to other aspects of the case, it should be borne in mind that the doctrine of *falsus in uno, falsus in omnibus* in connection with the testimony of witnesses[2] was rejected by this Court precisely in *People* v. *Nieves*, 57 P.R.R. 769, 785, in which we said:

". . . When a witness is false in one part of his testimony, he is to be distrusted in the remaining portion of the same; *but this does not mean that that portion should be rejected in its entirety.* The jury must act with caution knowing that they are not treading on firm ground, *but if, in the exercise of their discretion, they are convinced that the rest of the testimony is true, they may take it into consideration when rendering their verdict.*" (Italics ours.)

And in California it has been held that the doctrine referred to can not be invoked on appeal on a review of the facts as found by the lower court in accordance with the

---

[1] There is no imputation here of passion, prejudice or partiality.

[2] Section 524 of the Code of Civil Procedure, subdivision 3 (§ 162, Law of Evidence), reads: "A witness false in one part of his testimony is to be distrusted in others."

evidence, since it is intended as a guide to those who must hear and see the witnesses and thus receive the evidence at first hand. *Brandt* v. *Krogh*, 111 Pac. 275, 279.

This being the prevailing rule, the lower court was not bound to reject in its entirety the testimony of appellees' witnesses. And said oral evidence, together with the documentary evidence, is in my judgment sufficient to uphold the judgment appealed from.

As to what interest the officers involved in this case could have had in perpetrating the fraud, they probably know. We do know of the fact, of which we can take judicial notice, that they were promoted notwithstanding that this action was pending in this Court.

I believe that the conclusion reached in the dissenting opinion is erroneous insofar as it states that only where an arrest is made for operating a *bolita* bank, may the money that the person arrested has, be seized. A person having *bolita* lists may also have money connected with said game. Anyway, it is not incumbent on the police to determine what pieces of evidence it must or must not seize. Its duty is to seize them all. Moreover, it is incomprehensible that on the one hand it be held that Soto was the banker of *all* the collections—we do not know the total amounts of the wagers in all the lists—and on the other it be held that the amounts seized on him only amount to $61.49.

To me it still is fantastically unlikely that the appellees herein would park near police headquarters to handle *bolita* material, no matter that there was a commercial wagon in front of their automobile. Nevertheless, if we were deciding the appeal in the original case, the trial court having believed said evidence, we would also leave its conclusion undisturbed.

I personally believe—and I refer to some of my dissenting opinions in the past—that this Court has been extremely liberal in its construction of the *Bolita* Act and especially in not requiring strict compliance with the Act on search warrants obtained by the police in *bolita* cases. I also think that

possibly this action on our part has resulted in a situation of facts as those disclosed by the instant case, that is, that there may be police members who in fact believe that any action on their part and because the defendants are *boliteros* will be approved by the courts. It is high time for them to know that they are mistaken and that even the "leaders of the underworld" are entitled to be tried and convicted only through the lawful means provided by our laws.

I am unacquainted with the "leaders of the underworld" engaged in the unlawful game of *bolita*. If any has escaped from the clutches of justice, it has only been because the facts and the Act have thus justified it—to that effect see the previous case against Soto in *People* v. *Soto*, 71 P.R.R. 776, wherein we reversed the judgment because the search made by the police was unlawful— [3] and not due to any other circumstance.

---

MR. JUSTICE NEGRÓN FERNÁNDEZ, dissenting.

For the second time José Soto Zaragoza—one of the leaders of the underworld, engaged in the illegal game of the *bolita*—escapes from the clutches of justice.

First—with my vote in favor and without the intervention of Mr. Justice Snyder—we reversed a judgment against him on the ground that the evidence on which he was convicted was obtained by an illegal search made at police headquarters, because he had been likewise illegally arrested. *People* v. *Soto*, 71 P.R.R. 776.

Now—with my dissenting vote—this Court affirms an order setting aside a judgment against him, on the ground that his conviction was obtained by fraud. This fraud consisted in that certain lists of *bolita* numbers—which were admitted in evidence at the trial against him—were planted

---

[3] That was the case to which Soto referred upon saying that he had been "framed" by detective Virella, and from the opinion delivered in said case it can hardly be inferred that said statement is "absurd."

in his automobile by a detective for the sole purpose of fabricating a case against him.

The opinion of the majority accepts the findings—erroneous in my opinion—made by the lower court on the basis of discredited testimony, essentially perjured, and severely condemns, unjustly, several members of the detective force, —one in particular—as the authors of a criminal conspiracy to obtain the conviction of José Soto Zaragoza and Harry Lake Penn of a violation of § 4 of the *Bolita* Act.

If detestable and contemptible "to the heart of our democratic institutions" is a conspiracy among peace officers to obtain the conviction of two citizens on perjured testimony and spurious evidence, just as dangerous and contemptible to the stability and enjoyment of democracy in one of its most vital functions—the judiciary—is to permit that the virtuality of the orders or judgments of the court be destroyed and left to the mercy of those, who in their own interest, weave with the yarns of false testimony an inconceivable fraud—taking advantage of a factor inherent in their own clandestine activities—in order to give color to a legend of a conspiracy engineered by police officers to convict those two citizens.

Like the Court does in its opinion so shall I begin by making my own summary—since we can not dispense with it in considering the evidence in the lower court to set aside the judgment of conviction on the ground of fraud—of the evidence presented both at the trial against José Soto Zaragoza and Harry Lake Penn and at the hearing of the motion to set aside the order.

### TESTIMONY AT THE TRIAL

*Modesto Castro*, detective, testified that on May 27, 1950 he was on duty in the metropolitan area in the squad against vice, under Sergeant Luis V. Costas. About 11 p. m. he was at the police station at Stop 6½ on Fernández Juncos Avenue in San Juan, with three men "who had been arrested" on a

*bolita* charge. A young man about 23 years of age, white, arrived and inquired why those three "young men" were under arrest. Castro asked him what was his relationship and if he was travelling with them, to which he answered: "No, I am travelling with Chichí." Castro again asked him "Where is Chichí?" to which the young man answered "I do not know." Then Sergeant Costas told the witness to take a walk "around the block" with Quiñones, another detective.

Castro and Quiñones left the headquarters and walked along the southern side of Fernández Juncos Avenue towards San Juan. Quiñones walked on the inside and the witness on the outside until they reached an old commercial wagon behind which a Cadillac was parked. The defendants were sitting on the front seat of the car with the inside light on. The wagon as well as the Cadillac were looking in the direction from San Juan to Santurce, on the right hand side, close to the sidewalk. The car was parked at a distance of five or six feet from the wagon, in front of "the entrance to pier No. 12."

Next to the detective headquarters, with an alley in between, there is the "Pontiac" building, then another building and finally a gasoline station which is on the corner of the street having an entrance to pier No. 12. The distance between the wagon and headquarters "was more or less as from the corner of San José Street," "approximately 70 feet." After the witness passed the wagon and he was about 6 or 8 feet away, he saw the Cadillac and the two defendants inside who had in their hands paper lists with numbers of three digits and units to the right. Although the light inside the automobile was on, Castro also used his flashlight "in order to be certain." Harry Lake Penn was paging the lists which he held in his hands at the height of his belt and Soto Zaragoza was passing them from one hand to another, "he shuffled them from one side to another." When the defendants noticed the presence of the detectives, Lake Penn

passed the lists which he had in his hands to Soto Zaragoza and the latter put them together and threw them in the rear of the car on the floor. Lake Penn, who was on the driver's seat, tried to start the car, but Castro turned off the switch. "It was a matter of seconds," testifies Castro, "it was very quickly. The other man [Soto] threw the list and I took the switch." Castro asked Quiñones to pick what Soto had thrown. Then Quiñones opened the right rear door of the automobile and took the lists. Then Castro asked Lake Penn to let him have the wheel, that he was going to drive. He moved to the right where Soto Zaragoza was and Castro drove the automobile up to the front of the police station.

When they reached headquarters Soto Zaragoza was searched and a yellow paper with printed numbers of three digits was found, among others, in the right pocket of his jacket, to which the witness refers as "numbers limited to four dollars." Among the lists of numbers with three digits which the witness saw in the hands of Harry Lake Penn there was a "long" list which began with number 101 and the letters "C. B." and then number 15, that is, the amount of money wagered on said combined number. The witness explained that the letters C. B. meant "combined," that is, that all the numbers of three digits that could be combined from the three numbers contained in 101 were being played.

When Castro drove the car to the station, Quiñones took the rear seat. The car was parked in the "little alley" in front of headquarters. There the detectives alighted from the car together with the defendants and they took the latter to Sergeant Costas. It was there that Castro searched Soto Zaragoza and found on him, in addition to the other papers already mentioned, a wallet in his rear left pocket containing money. Castro did not count the money although he opened the wallet, examined it and saw $10 and $20 bills, "a great deal of money." He returned the wallet to Castro without taking the money. After this, Soto Zaragoza "alleged" that he kept in his automobile certain papers of

inscription of horses and that the detectives were responsible of those documents, to which Castro answered, that if Soto wished they could search the car and return them to him to which Soto Zaragoza consented. The search was made by detectives Quiñones and Castro. Neither Costas nor the other detectives at headquarters participated in the search. In the trunk of the automobile they found some bottles of whiskey and in the glove compartment he had lottery tickets and some papers of inscription of horses. The testimony of this witness ends in the following manner upon being cross-examined by counsel for the defendant:

"Q.—Witness, when you approached the car for the first time did you search it there?

A.—No, sir.

Q.—When you searched it in front of headquarters did you search it at the request of Mr. Soto?

A.—At the request of Mr. Soto. *He first spoke to me and called me and asked me to help him in this case and to go later to his house.*

*Judge:*—What was that?

A.—*José Soto Zaragoza told me to help him in this case and that I should go to his house later.*

*Mr. Archilla Laugier:*

Q.—In whose presence did he say it?

A.—Nobody's.

Q.—At detective headquarters?

A.—In a small ditch where there is a curb.

Q.—He told you that?

A.—Yes, sir.

*Mr. Archilla Laugier:* That is all, Your Honor." (Italics ours.)

When detective Castro finished testifying it was 10:00 to 12:00 a. m. Counsel for the defendant did not want the witness who had testified to join the others because he would have the opportunity "of commenting the case" and asked that the next witness be called. Then the following dialogue took place:

"*District Attorney:* —What is your purpose in calling that witness now?

*Judge:* —I do not see.

*District Attorney:* —I want the attorney to tell me.

*Mr. Archilla Laugier:* —*Because this witness is going to tell the truth.*

*District Attorney:* —Does the attorney know?

*Mr. Archilla Laugier:* —*I know.*"   (Italics ours.)

The trial judge then ordered the witness Federico Quiñones Padró—the other witness for the prosecution with whom the district attorney had announced he would close his case— to remain under the rules of the court and ordered the marshal to have dinner with him and not to allow any person to speak to him on any matter and to return immediately to the court.

*Federico Quiñones Padró,* when called in the afternoon session of the trial, testified that he was a detective and that on the evening of May 27, 1950 he was on duty in the metropolitan area in the squad against prostitution which was under Sergeant Luis V. Costas. That about 11:00 p. m. he saw the defendants in a Cadillac which was parked between pier No. 12 "and the entrance to the gasoline station of the Pontiac" at a distance "of approximately 400 and odd feet" from the detective headquarters. The car was facing Santurce and in front of it there was a commercial wagon. (In accordance with the transcript of the evidence the witness situated the wagon at a distance of 15 or 16 feet from the car and immediately thereafter he situated the automobile "at about 6 inches from the wagon.")

Quiñones and Castro then walked along the sidewalk from headquarters towards San Juan after Castro, upon being asked by a young fellow who arrived at headquarters why was a certain "Pichín" in jail, asked the witness to go with him in the direction stated. Quiñones walked on the inside of the sidewalk and Castro on the outside. They both carried flashlights. Upon reaching the Cadillac the witness lighted the flashlight and saw "in the shape of numbers" in

the hands of defendants "of four digits, of five, in yellow papers, or red." Castro grabbed Harry Penn Lake who was on the driver's seat and told Quiñones "Get in front and let's go to headquarters." Soto Zaragoza commented "We go where you please." Upon reaching headquarters in the automobile, the witness, who had seized some newspapers, lottery tickets, and a lottery list as well as some grocery bills and "some square notebooks," went up with said material and placed them on the desk of the night guard. Detective Rivera Rosa went out to search the automobile and asked the witness to search it with him. When Quiñones opened the door he found in the rear seat, on the floor, a package of "37 *bolita* lists" and then he said to Rivera Rosa "Don't search anymore. Here is the evidence." Comparing them with those that the district attorney had in his possession and which were previously identified by detective Castro, Quiñones denied having seen those lists prior to that date. The district attorney then showed him a sworn statement which the witness admitted having made before the district attorney on May 28, 1950 in his office and having signed it in his presence. The cross-examination of the district attorney continues as follows:

"*District Attorney:* Read it completely. (The witness reads the affidavit.)

A. Here it says detective Castro.

*District Attorney:* Do not say what it says, but when you finish reading it let me know.

Q. Did you read it all?

A. Yes, sir.

Q. Tell the court whether the district attorney forced you to say what is written there.

A. *I was not forced.*

Q. *Did you say it freely and spontaneously?*

A. *I said it spontaneously.*

Q. Now tell the judge whether or not it is true that you said that when you reached the car you noticed that these two

defendants were manipulating numbers with dashes with three digits and one unit to the right, tell me whether or not it is true?

A. I say that I saw numbers. I do not see well, let us say, at a distance of 14 feet, I saw numbers.

Q. So that you did not say what is written here, numbers with dashes and numbers to the right, that you saw them in the hands of the defendants?

A. When I seized them.

Q. Tell the judge whether or not it is true that you said that you saw when Harry Lake Penn, this man here, tried to start the car and Modesto Castro held him?

A. He held him and then turned the switch on again.

Q. And tell me whether or not it is true that you said that Chichí was sitting next to him, that Chichí took them together with the others he had in his left hand and tried to start the car; whether you said it or whether the district attorney put it there. Whether you said it or I put it there.

A. *It says it there.*

Q. *Who said it?*

A. *I said it.*

Q. Did you say it in my office?

A. Yes, sir; to corroborate the accusation I have to say that I saw it.

Q. *The district attorney did not ask you to say it?*

A. *Nobody did.*

Q. *Did you say it before me?*

A. *Yes, sir.*

Q. Tell me whether you said, then we proceeded to arrest these individuals and to seize the car, that upon reaching headquarters we proceeded to search the car.

A. Yes.

Q. And detective Castro found on the person of Chichí, Soto Zaragoza (look at him there) some papers with *bolita* numbers, that is, numbers of three digits and numbers to the right.

A. Yes.

Q. Tell me whether it is true . . .

A. I searched this man.

Q. 'I searched this man,' and you point for the purposes of the record at Harry Lake Penn.

Q. Tell me whether you testified what is said here: that when we reached pier No. 2 with the inside lights in the car,

behind the commercial wagon, we went directly to said car, I by the right side and Castro by the left.

A. It is No. 12.

*District Attorney:* Here it says 2 but it is 12.

A. 12.

Q. We each used a flashlight.

A. I was carrying a flashlight.

Q. Upon noticing that they were manipulating and passing this *bolita* material because it could be seen that they had numbers with a dash and numbers to the right. Tell me whether this is true.

A. I saw numbers.

Q. In whose hands?

A. In the hands of this gentleman because he was handling some lottery numbers that they had in front. I am sure I saw numbers.

*Judge:* Do you say he had numbers?

A. He had lottery numbers.

*District Attorney:*

Q. Where are they?

A. I suppose they were delivered. I do not know.

Q. Those lists that were there, where were they seized, the lists which I showed you a while ago?

A. The lists that were seized in the automobile, are punctured.

Q. Are these the lists? Is this the puncture which you mentioned?

A. That is the puncture. They were bound together.

Q. Where were those lists seized?

A. In the rear seat of the car.

Q. Who threw those lists on the seat?

A. I found them there, whoever threw them knows, whoever did.

Q. Now tell me something, *after having made this statement which you admitted you made for the district attorney, tell the Honorable Judge if on a subsequent date you appeared before the district attorney to tell him that this statement is not true.*

A. .

*Judge: Answer.*

Q. Whether on any occasion after May 26 on which date you made this statement which you admitted you did, whether

you have addressed the district attorney to tell him that what is said here is not true?

A. I am going to tell you something.

*Judge: Answer.*

*District Attorney: Answer whether you came to me.*

*Judge:* The court orders you *to answer* categorically the questions made by the district attorney.

*District Attorney:*

Q. Whether you have come to me to tell me that *what is said here is not true, on a subsequent date?*

A. *I did not say that to you, I have said nothing.*

Q. Although it says something different?

A. I am telling the truth in the name of God.

Q. Then this is your statement?

A. *That was my statement.*

Q. *You made it at the district attorney's office before me?*

A. *Yes, before you.*

Q. *What is said here, is that what you said?*

A. *Yes, sir.*

Q. *No one forced you to say this, you said it?*

A. *I said it.*

Q. Then the truth is that that material was seized on these two persons?

A. It was on the rear seat, on the floor.

Q. When you arrived you saw the numbers which you say this man had?

A. I seized some lottery lists and some tickets of the regular and special lottery. A mortgage of twenty-two or thirty-three thousand dollars, was seized at headquarters.

Q. What was this man doing?

A. He was sitting there.

Q. And the other one?

A. Sitting.

Q. What were they doing?

A. Sitting down.

Q. What else were they doing?

A. They were sitting down.

Q. What were they doing?

A. They had some papers in their hands.

Q. What kind of papers?

A. Of the lottery and a lottery list and some bank books.

Q. Where are those lottery lists? You as a detective should know.

A. They were taken to headquarters as his property.

Q. Are you still a detective?

A. I think I am going to quit.

Q. Why are you quitting?

A. Because of a personal matter that you know. This also has me confused, your Honor." (Italics ours.)

The cross-examination of this witness began with the following explanation offered by him to justify the contradictions in his testimony at the trial in connection with his sworn statement before the district attorney.

"CROSS-EXAMINATION OF THE DEFENSE:

*Mr. Archilla Laugier:*

Q. Quiñones, you have taken an oath to tell the truth this afternoon.

A. Yes, sir.

Q. You have answered the questions of the district attorney?

A. Yes, sir.

Q. On several occasions you have wished to address the judge to explain something. I ask you to explain to the judge what you have intended to explain.

A. Your Honor, I have waited for this opportunity. I have a problem at home which makes . . .

*Judge:* Speak out loud.

A. I lost a brother as a result of an automobile accident. I lost my father 32 days later and as a consequence I had to confine my sister in the Insular Insane Asylum. *This makes me give that sworn statement, which I have admitted was under oath.*

*Judge:* Is it true what is stated there?

A. *I made a statement before the district attorney which contained some errors, mistakes, errors, and I have wanted to come with my soul and my conscience at peace.*

*Mr. Archilla Laugier:* In harmony with your clean conscience, I want you to explain the truth of the facts that are being tried here today.

A. I explained to the district attorney that I do not know this man, the first time I saw him.

*Judge:* Which one?

A. That man, the one that is there.

*Judge:* Soto Zaragoza?

A. Yes, sir.  The other detectives know him.  *I have had no need, do you understand, to go to any person who is a violator of the law to ask him for money.  I am an honest man.*

*Judge:* And is there anyone who does it?

A. I do not say there is.  I mean to say that I have been in no need for their help, I can never say I have.  At any time I do honor to the police force and even if I do not belong to it, I shall still honor it.  My conscience is now clear.

*Mr. Archilla Laugier:*

Q. Do you care very much for that honor?

A. I am an honest man.  I belong to a sect.

Q. Did you lose your father, on what date, please forgive my bringing up these things to your memory.  When did you lose your father?

A. On the 28th, the day after this happened."  (Italics ours.)

After this explanation, the witness substantially repeated the testimony given by detective Castro as to the manner in which they approached the automobile from headquarters. Then he continued saying that he saw Lake Penn with some yellow papers which the latter passed to José Soto Zaragoza. Upon getting into the front seat he seized the lottery tickets and lists.  Castro gave the automobile key to Lake Penn, who drove up to the police station.  In front of the station, when dismounting the car, Soto Zaragoza told detective Castro to search the car.  Castro took a bottle of whiskey out of the trunk.  At that moment Quiñones was at headquarters "checking the lottery numbers to see if there were more *bolita* numbers," and upon being asked by Rivera Rosa to search the car he found the *bolita* lists as already stated.  No other person except Rivera Rosa and detective Castro came near the automobile while Quiñones was at headquarters. Castro searched Soto at the station and seized on him "some papers, pieces of about four or five inches with different numbers."  On that same night, at about 3 a. m. the witness and Sergeant Costas arrested Lake Penn in a taxi at Stop 15.  Judge Rodríguez Aponte ordered Soto to furnish

bond for $5,000 and Lake Penn for $1,000. "They were both locked up in the bull pen."

The court admitted in evidence, over the objection of the defendants, the 37 lists of numbers of three digits with the unit to the right and other papers which were seized on the defendants according to the testimony of detective Castro. It also admitted, without objection, the sworn statement given by the detective Federico Quiñones Padró before the district attorney which the latter offered for the purpose of impeaching his credibility.

The evidence of the defendants commenced with the testimony of *Ramón Pérez Méndez*, who stated that he was 19 years of age and lives in Monserrate Street. At 11 p. m. of May 27, 1950 he was in the "Blue Room" in Santurce, a business of his father, who was there together with him and José Soto Zaragoza. His father received a telephone call to inform Harry Lake Penn that his brother Luis Santos Lake had been arrested. He did so. Soto Zaragoza (Chichí) then appeared in a Cadillac. Pérez and Soto waited for Lake Penn to get dressed and Pérez also went to get dressed and later boarded the automobile "for curiosity." They arrived "in front of the station" and the witness alighted from the car and asked detective Castro what was the charge. Since they were coming from Santurce, when Pérez got down, Lake Penn and Soto continued in the car in order to turn back and pick him up in front of the station "in order to see whether they had to post a bond or something." They parked the car "in front of the Department of Labor next to the Pontiac building." From the doorway of the police station, where the witness was standing, to the place where the automobile was parked, there was a distance of "5 or 10 feet." The car stopped between the station and the Pontiac building, where there is a "passageway."

When Pérez asked "what was the charge against Luis Santos," Castro told him "you are travelling with Chichí" and then Castro and detective Quiñones "came to Chichí

with a flashlight." The witness went along with them. Castro came along the side of the driver and Quiñones along the opposite side, but they did not seize anything on the defendants. Neither Soto nor Lake Penn had anything in their hands, no lottery lists, no lottery tickets. Then "they searched the car and went inside the car," Castro in the front and Quiñones in the rear. Pérez also tried to get into the car but Castro told him not to do so, to go to the station, and then the others drove ten feet "and parked the car in front of the station." Castro stayed in the car and Quiñones went up to Sergeant Costas and returned with two other detectives. They again searched the car. While they were searching it, Quiñones appeared "with *bolita* pages which he had found in the rear of the car." Soto then said "they are going to put me in prison, the devils," to which Quiñones replied, "it is impossible for me to plant *bolita* numbers in your car, as I do not know you." Soto told them "you shall pay for this, you can not put me in jail in this way." Neither Soto nor Lake Penn were searched in his presence. After Quiñones found the *bolita* pages in the car, Pérez went away and saw nothing else.

*Jaime Cabre, Jr.*, accountant of the City Taxi, Inc., which is engaged in the transportation of passengers, testified that on the evening of May 27, 1950, according to the record of calls of said corporation, there was a call from the police station to go to 506 Bouret in car number 14 driven by Salvador Arcelay, from 12:20 a.m. to 12:50 a.m., the fee being one dollar.

*Salvador Arcelay*, chauffeur of the City Taxi, received order by radio telephone to go to the police station. There defendant Lake Penn took the taxi, put some cases in the car which took him to 506 Bouret Street where it left him.

*Harry Lake Penn, defendant*, testified that on May 27, 1950 at 10:00 p. m. he was sleeping at his house when Ramón Pérez called him to tell him that his brother Luis Santos Lake was arrested, according to a call received by Pérez's

father. The witness dressed and as he left he met Soto in the car. They went to police headquarters. "Then when I passed by headquarters very slowly, Castro was in the doorway and kept looking at the car . . . then I turned and parked the car *in front of the entrance which separates headquarters from the Pontiac building*." (Italics ours.) There is a government office in front.

Detectives Castro and Quiñones came down from the station. Castro went by the side of the witness and Quiñones by the side of Soto and they threw the light of their flashlights on their faces. Neither Lake Penn nor Soto had anything in their hands at that moment. They were waiting for Ramoncito (they refer to witness Ramón Pérez Méndez). The witness asked Castro why did he throw the light on them and the latter said "Nothing," while he opened the front door "and began to search the car" telling Quiñones "Go on in front." Soto protested saying "You can not get in here" but Castro again told Quiñones to get into the car and the latter went in the front seat. The car was "about 10 steps" from the station. "Ramón was going to get in" but Castro told him not to do so. "Upon seeing his attitude [Castro's] which was violent I drove forward and when I stopped in front of the station I gave him the key."

After this, Quiñones went to the station and Castro went to open the trunk. He was unable to do so and then he asked the witness to open it and when the latter raised the lid of the trunk they saw some cases of liquor there. Soto and Lake Penn began to take them out. At that time Quiñones came back with two other detectives, Luis Parrilla and Rivera Rosa. While they were taking the cases out, Quiñones opened the door of the car and said: "It is here, do not look any more." Soto told him "You have planted that there, you can not do that to put people in jail." Up to that moment neither he nor Soto had been searched. Shortly afterwards Soto was taken to the station.

Sergeant Costas came down and asked the witness to open the glove compartment of the car. He did so and took out "some tickets and some papers of inscriptions of horses." Costas ordered Rivera Rosa to make an inventory and have Lake Penn sign it. The inventory included the bottles, the cases of liquor and the papers of inscriptions of horses. Costas said "You can take all this." He put them in a taxi which a detective called and which took him to 506 Bouret Street. The witness says "I took another car and returned to Stop 15 and I was talking with the boys and they told me: 'How is it they let you go?' *I was not mixed up in that mess* and I went to keep my car and while I was locking it, more than two hours later, while I was closing the car, Sergeant Costas, Quiñones, Parrilla, Rivera Rosa and Castro appeared." All of them, except Costas, searched the car. The witness then said "only one should search the car because right now they planted some papers in front of the station." They found nothing but still he was arrested—about 3:00 or 3:30 a. m.—and confined in the Princesa jail after having taken him to the judge.

Although he has worked as chauffeur for José Soto Zaragoza for about 10 or 15 years, the witness knows that Soto "has many houses at Barrio Obrero and Stop 15," but that "besides houses I do not know" what other business he has. When he reached the jail Soto had already left. When he was asked by the district attorney "Where did those lists come from?" he answered "About those lists, detective Quiñones went up to the station and he came down together with other detectives. I saw when Quiñones came out and opened the door and said: 'These papers that are here, look no more.'" That night the witness saw the municipal judge at police headquarters.

It was stipulated by the district attorney and the defense that if the officer who committed José Soto Zaragoza to jail should testify, his testimony would be in the sense that among

the articles that "José Soto Zaragoza delivered, there was no wallet but he did have the amount of $1,937.00."

The case was thus submitted and Judge Francisco Torres Aguiar who presided the court, giving entire credit to the testimony of Modesto Castro—besides considering that detective Federico Quiñones Padró corroborated substantially Castro's testimony, notwithstanding the contradictions between his statement at the trial and the one he made before the district attorney—found the defendants guilty and sentenced them to serve, José Soto Zaragoza two years and Lake Penn one year in jail.

The trial was held on June 30, 1950 and the above sentence was pronounced on that same date. On July 3 following the defendants moved the trial judge to set aside the judgment on the ground that "defendants have discovered sufficient evidence to convince the court of their innocence for which reason they propose to file a motion for a new trial, which they were precluded to do because the court rendered judgment in the case." The motion for a new trial was filed on the 10th, it being alleged in its pertinent part:

". . . That on May 27, 1950 at about 10 or 10:30 p. m. the facts charged against them were the result of a conspiracy on the part of the witnesses for the People of Puerto Rio who planted in the automobile occupied by the defendants the evidence which tended to incriminate them and by virtue of which they were convicted.

"3. That the defendants have newly discovered evidence which had it been presented at trial would have changed the outcome thereof and the defendants would have obtained a judgment of acquittal, consisting said evidence in the testimony of witness Luis Santos to the effect that the evidence allegedly seized on the defendants in the evening of May 27, 1950, had been seized on said Luis Santos, shortly before the arrest of the defendants in the neighborhood of the police station at Puerta de Tierra, Puerto Rico.

"4. That the defendants had no knowledge until the very moment of the trial of the evidence which would be used against

them, and that it was not until July 3, 1950 that the defendants learned of the source of the evidence presented against them.

"5. That the defendants attach and make part of this motion the affidavit subscribed by Luis Santos."

In the affidavit of Luis Santos to which the motion refers, made by him on July 5, 1950, the witness states:

". . . That on May 27, 1950 at about ten or ten thirty p. m. I was caught by the detective with several *bolita* lists which were seized on me and I was taken to the police station at Stop 6½ in Puerta de Tierra, which lists were seized.

"3. During the trial held on June 30, 1950 in the District Court of San Juan against José Soto Zaragoza and Harry Lake Penn *I was present* and I can affirm and do hereby affirm under oath that the *bolita* lists which were presented against the defendants José Soto Zaragoza and Harry Lake Penn as if possessed by them, were part of the lists which were seized on me on the evening of May 27, 1950.

"4. That the lists which were seized on me that evening had an identification on the back of each one and that said identification of the lists presented against José Soto Zaragoza and Harry Lake Penn corresponded to those which were seized on me. . . ." (Italics ours.)

Both the motion to set aside the judgment and the motion for a new trial were denied on July 12 and on that same date the defendants appealed. On January 16, 1951, after they had perfected their appeal and the briefs of the appellants as well as of the People, as appellee, were filed, they prayed this Court for permission to desist from their appeal, stating that because of newly discovered evidence subsequent to the judgment, indicative that the evidence adduced against them at the trial was the result of fraud, they intended to resort to the lower court again to obtain relief to set aside said judgment. Having desisted from their appeal, José Soto Zaragoza filed a motion in the lower court on January 22, 1951 praying that the judgment be set aside on the following ground:

"2. That the judgment rendered was based on the testimony of the two detectives and one package of lists of *bolita* numbers.

"3. Said documentary and oral evidence is false and fraudulent and was the result of a collusion perpetrated, knowingly, to make it appear as if said lists of numbers had been seized in the possession of defendant and inside his automobile, the truth being that those lists had been seized that same night on which defendant was arrested, several hours previously, in possession of other persons who were arrested that same night for the same offense; that the lists seized on the other persons were fragmented or separated in order to introduce in defendant's automobile part of those lists and later testify that they had been seized there; and that the judgment thus obtained was vitiated by fraud and perjury.

"4. On the day of the trial of the defendant in the present case, during the trial and until after judgment was rendered, the defendant had no knowledge of the facts herein stated for which reason it was impossible for him to submit evidence thereof to this Court especially if it is borne in mind that since sentence was pronounced in the case immediately after the introduction of the evidence, the defendant had no opportunity to move for a new trial after having discovered the evidence warranting fraud, perjury and collusion. . . ."

### TESTIMONY AT THE HEARING ON MOTION TO SET ASIDE JUDGMENT AS NULL.

Judge Rodolfo Ramírez Pabón, who presided the hearing on the motion to set aside judgment as null, heard the following testimony:

*Luis Santos Lake*, half brother of Harry Lake Penn, testified that on May 27, 1950 he was arrested about 9 p. m. at Stop 15 on a *bolita* charge. The detectives found three packages of *bolita* lists (from the collection he had made) in the back pocket of his trousers. One was from Barrio Obrero and two from Loíza Street. Each one of the lists of one of the groups or packages was marked with a number "6" on the back and another with the word "*Río*," which corresponded to Barrio Obrero. He was arrested and conducted to the detective headquarters at Stop 6½ in San Juan and locked up in the bull pen." The three packages were put on a desk and he did not see them any more.

The witness, who pleaded guilty on July 6, 1950 of the charges filed against him and was sentenced to six months in jail, was present at the trial held on July 13, 1950 against Francisco Vázquez Ortiz and Luis Muskus, who had been arrested together with him on May 27. During the trial he noticed "that the number of lists of the '14' collection was considerably smaller than when it was seized in my possession." He was also present at "some parts" of the trial against José Soto Zaragoza. (Held on June 30, 1950.)

The three collections consisted of more or less the same number of lists. Witness identified the group of lists marked with the number "6" on the back, 62 lists in all. He also identified a group of lists corresponding to Barrio Obrero, consisting of 57 pages and the group of the "14" collection which consisted of only 11 pages. These lists had been introduced in evidence at the Vázquez and Muskus trial.

The witness identified thereafter the lists of *bolita* numbers which were introduced at the trial against Soto Zaragoza and Harry Lake Penn, and when asked whether he had seen them before, he answered affirmatively. "I saw them in court that day, in that courtroom (referring to courtroom "C") and I saw them the day that I was carrying them with me." He explained that the lists presented to him had the number "14," which looked like a "17" on the back of each one. That was the same identification of the 11 lists belonging to collection "14" that had been introduced at the trial against Francisco Vázquez and Luis Muskus, and all of them belonged to collection "14" seized in his possession the night he was arrested. The number "14" was written on the back of the lists "to identify each collector."

Asked whether he knew of any other detail by which he could strengthen his affirmation that the lists presented in evidence against Soto and Lake Penn were a part of the lists which had been seized on him, he stated that he remembered having played 15 cents on the number 101 C. B. with a

*bolitero* named Pedrín Santiago, whose lists were a part of the "14" collection. The agent who collected the *bolita* lists was identified with the number "14." Number 101 C. B. was not found in the 11 lists of the "14" collection which were introduced in evidence at the Vázquez trial but it was found in the group of 37 lists introduced in evidence at the Soto trial. That same number 101 C. B. 15 was mentioned by detective Modesto Castro at the trial against Soto and Lake Penn on June 30, 1950 upon referring to one of the *bolita* lists that he was identifying from among the ones found on defendants. (Because these lists form part of the evidence in the appeal that Soto and Lake Penn had taken to the Supreme Court, they were in the possession of the Clerk of this Court, who took them with him on the day of the hearing of the motion in a sealed and stamped envelope over which there was a certificate of the clerk of the lower court.)

Witness collected *bolita* lists for Roberto Andújar in Loíza Street and no other place. He did not know any other *bolitero*. He had seen Soto Zaragoza at Stop 15. He did not know what business Soto was engaged in, nor had he heard him "mentioned" among the Santurce *boliteros* although his brother (Harry Lake Penn) is Soto's chauffeur. He had started working as an agent for Roberto Andújar only two months ago, for he had always worked as blacksmith. He never collected *bolita* numbers for "Chichí" (Soto). On May 27 when witness was arrested he did not know Mr. Gustavo Jiménez Sicardó, but after Soto's trial he spoke with him in the attorney's office "and asked him to find out if the lists . . . had a '14' on the back thereof." He went to Mr. Jiménez Sicardó even though he did not know him "because my brother was involved in this." He did not know how long his brother had been working as Soto's chauffeur.

Witness did not know the name of the agent for the "14" collection. He was twice at his house. Sometimes he went and asked him if the collection was ready and if he said

yes, he picked it from under a garbage can near a green bar on Loíza Street. Witness never counted the number of lists.

The night he was arrested he came from "the waterfront," where they took some gasoline, in a car with Francisco Vázquez. Muskus and six women were also in the car. He did not know the make of the car or to whom it belonged. He identified a group of lists from among the ones presented at the Vázquez and Muskus trial, which were bound by some staples. Within this group there were lists which did not have on the back neither a "6" nor a "14" nor "*Río*," stating, however, that in the first page of this last group the word "*Río*" was written, and that all the pages of that group belonged to the Barrio Obrero collection. He did not go to see Mr. Jiménez Sicardó before Soto Zaragoza's trial because even though he knew that they had been caught with *bolita* "he did not know what collection had been seized or anything." He stated that it was impossible for two *boliteros* to have the same identifying number "14." Asked why it could not be so he said: "If you have number '14' and if you have played 897 and 897 comes out with a '14' you can come to claim the number. Q. Explain it better, I don't understand. A. You have a '14' and Jiménez Sicardó also uses '14'; you play 897 and Jiménez Sicardó can come and say: I won. Q. Why can he do so? A. Because both have number '14'."

Witness was the only person in charge for collecting the "14" collection for Andújar, and the day he was arrested he collected all the "14" lists. He only collected for Andújar's bank. Witness looked over the "14" lists when he picked them from under the garbage can and he did not count them. The lists which were seized on him on May 25 corresponded to the drawing of Sunday 28th, but they had no date because they never carry a date.

*Gustavo Jiménez Sicardó*, Attorney, testified that on June 30, 1950, after the Soto and Lake Penn trial ended and they were sentenced by Judge Torres Aguiar, Mr. Ar-

chilla, Miguel Soto (brother of defendant José Soto Zaragoza) and the witness went to his office "to see what could be done, if they could appeal, etc." Fifteen minutes later, Luis Santos, whom the witness did not know till then, arrived and told him "that the evidence introduced against Soto are the papers they seized on me." When the witness asked "Why?" he answered: "Go there and see what it says on the back of the lists." He went to court and examined the documents noticing that they had "like a 17" on the back and upon telling it to Santos, he told him that they were the same. He could not see the lists in the case against Santos as the latter had not yet been tried and the district attorney did not let him see them.

Santos pleaded guilty on July 6. Witness went then to the clerk's office to see the documents and was able to verify that the two numbers "14" were alike, "it could be noticed that the same person had written the '14' on both Soto's and Santos' papers." On July 13 Vázquez and Muskus were tried. Vázquez was convicted and Muskus was acquitted. At this trial the district attorney conceded that the same person had written the "14" which looked like a "17" on the lists introduced in evidence in both Vázquez and Soto cases.

Vázquez had told witness that a list of "limited numbers" which appeared in Soto's papers belonged to him and had been seized in his possession when he was arrested. "Limited numbers" are those "which have a limit as to the amount which can be wagered thereon because of dreams, etc. For instance, the number of the license plate of the banker's car is limited because they bet heavily on it." He heard Vázquez testify "that he saw Sergeant Costas go to the office and take some of the papers which had been seized from Luis Santos and go towards José Soto Zaragoza's car." In connection with what had been stated by Santos as to his having played No. 101 C. B. for 15 cents, the witness stated that "when the motion was set" Santos went to his office and he

asked him if there was any other way besides the peculiarly written "14" by which he could identify the lists of the "14" collection. After thinking a while, Santos told him: "In the '14' collection I used to play 101 C. B. for 15 cents and if my papers are the same as those of José Soto, they are either on mine or on José Soto's." The witness examined Luis Santos' lists but did not find No. 101. He came to the Supreme Court and could not "see them because they were in a sealed envelope."

*Francisco Vázquez Ortiz* testified that he was arrested on May 27, 1950, together with Luis Santos, Luis Muskus, the latter's wife, and five other women. At nine o'clock he was driving along Ponce de León Avenue towards San Juan in a Cadillac belonging to Francisco Carmona Ríos. He met Luis Santos Lake who asked him to take him to Barrio Obrero. The witness accepted and went to a service station in Stop 14, Fernández Juncos Avenue, to get some gasoline. While at the station Muskus came along with six women asking him to take him to the Ponceño Club. The witness told them "to get into the car," that he was going to Barrio Obrero. Upon turning on Cerra Street, near San Expedito hardware, a car drove across and four detectives dismounted. Luis Santos opened the door and started to run but he was pursued by two of the four detectives who brought him back. All of them were taken to the detective's headquarters at Puerta de Tierra.

When Santos and Muskus were searched, they found money and on the witness they found in his license "a yellow paper with printed numbers" which came from a "dream book" and which had no relation with *bolita* as such. Witness identified a yellow paper with a series of numbers consisting of three digits which had been presented in evidence against Soto at the trial of the latter, as the same paper of the dream book which had been seized in his possession at the station. The witness, Santos, and Muskus were locked up in the bull pen.

Detective Castro took the *bolita* lists seized on Santos into the office of Costas and put them on his desk. Both of them began to open the packages scattering them on the desk. About midnight he saw a young man appear and asked for Santos and when Castro told him "you travel with them," he answered: "I travel with Chichí." Costas then told Castro and Quiñones: "Go and take a walk." About fifteen minutes later a big car arrived and parked in front of the station, Quiñones dismounting with a package of lottery tickets. He entered Costas' office and Parrilla and Rivera Rosa left the office. While Quiñones was checking the lottery tickets, Costas took a handful of the lists which had been seized from Santos and which were scattered on the desk and went outside leaning on the right rear part of the car. He carried the lists in his "closed fists." When he walked away from the car he called Quiñones and he no longer had the lists in his hands. Costas went back to the station and Quiñones went to search "the rear of the car," and then "a violent discussion began" between the detectives and Soto Zaragoza and Lake Penn. He does not know whether Quiñones found anything when he went to search the car.

Before Costas went down the steps with the lists which had been seized on Santos and put his hands on the car, the trunk of the car had been already searched by detectives Castro, Rivera Rosa, and Parrilla. About fifteen minutes later Castro and Costas left and "put Soto Zaragoza in the bull pen with us." Costas told Lake Penn to take away "the cases of whiskey we found in the car." They returned the lottery tickets to Lake Penn and allowed him to call a taxi. Soto was not searched personally. Santos, Muskus, the witness and Soto were sent to La Princesa jail. He did not see Lake Penn in jail until next morning.

The witness was able to see when Costas took part of the lists which had been seized on Santos, went down, and put them in Santos' car because said car was parked "directly in front of the bull pen" about 25 feet away, it being "on

the right rear door where Costas put his hand and let the lists fall." Costas did all this in the presence of the witness and the first time that he told the story about Costas taking the lists and putting them in the car was on October 11, 1950, to Lic. Jiménez Sicardó. He remembers that date because on the 12th all prisoners with *bolita* charges and who worked on the streets were forbidden to go out. He worked in the police station at San Juan and when said attorney passed he told him what he had seen Costas do. He did not know Soto but made "prisoner's acquaintance" with him at La Princesa.

*Ramón Rivera Vizcarrondo* testified that two or three days before Soto Zaragoza's arrest he was in the District Court of San Juan serving as a juror and that he was sitting near the entrance of the district attorney's office. Costas arrived with some *"boliteros"* he had arrested. "He was sitting with those people and said these words 'I caught this small fry and I am going to catch Chichí with or without a collection.'" He does not remember the other persons present when this happened. Immediately after this, the witness went to see his friend Soto at his house, telling him what Costas had said. He testified that he had also told Soto to go to a district attorney and investigate what he had just told him, and that if he did not want to go with the witness to go with his attorney.

When the witness finished testifying the district attorney requested Sergeant Costas to be summoned stating: "A charge has been made against this officer and it is logical that he defend himself." Costas was summoned to appear the next morning.

*José Soto Zaragoza* testified that on May 27 his car was searched "directly in front of the police station" at Puerta de Tierra by detectives Quiñones and Castro. The inside light was on and the detectives searched the rear of the car with a flashlight but found nothing. Quiñones went up into the station with some lottery tickets which he had taken away from the witness while the latter had them in his hands.

Castro took the key away from Lake Penn and he and Parrilla went to search the trunk. They could not open the trunk and called Lake Penn to open it, which the latter did and they found some cases of whiskey.

"Castro ordered Harry Lake to take the whiskey cases out. While this was being done, *Sergeant Costas passed and leaned on the rear door of the car with his right arm inside the car and looking back toward us. As the car had been searched twice by Parrilla, Rivera, and Castro, I gave this no importance.* He went upstairs and as he went up detective Quiñones came and directing himself towards us with some papers in his hands, he said: 'Don't look any more, here it is.' He said: 'Look you bandit, how can you say that it is here? You put that here yourself.' " (Italics ours.)

Quiñones and Parrilla then went into the station and they went to the rear with Costas. They let him and Lake Penn "go free" in front of the station. About 20 minutes later Costas and Castro called him and put him in the bull pen with Santos, Vázquez, and Muskus. Lake Penn was not arrested, and he left in a taxi with the cases of whiskey, the lottery tickets, and some medicine for horses. The witness was not searched at the station, but he was searched at the jail where they seized $1,937 in cash. He had never before seen the *bolita* lists which were presented in evidence at the trial against him. He explained the nature of several other documents presented in evidence at the trial by the People.

Soto explained how *bolita* is played. He was in the *bolita* business until May 3, 1949, "when detective Virella framed me." The day of the trial he was assisted by Messrs. Archilla, Jiménez Sicardó, and Bosch, attorneys at law. When asked by the district attorney why he had not taken the witness stand the day of the trial to testify what he was saying at that hearing, the following incident took place:

"Q. And you took the witness stand the day of your trial to explain what you are stating now?

"A. No, sir.

"Q. Why?

"A. Because Mr. Archilla made a poor defense of my case.

"Q. Do you know when a case is well-handled, are you also a lawyer?

"A. Yes, sir.

"Q. Is this case well-handled?

"A. Yes, sir.[1]

The witness knew, through Rivera Vizcarrondo, that on May 27 "he had been framed." As to the origin of the lists introduced in evidence against him at his trial he learned the facts after the trial, when he had already been sentenced, "about a month later."

Soto remembers May 3, 1949 as the date in which he retired from the *bolita* business because on that date "they searched me in the street and nothing was found and I was later searched at the station and a paper was found in my pocket." Then the following examination by the defense took place:

"Q. Why did you go to the station?

"A. To furnish a bond for Harry Lake's brother.

"Q. Did you carry *bolita* lists with you?

"A. How could I go in front of the station with *bolita* lists!

"Q. Before that did you play *bolita?*

"A. Yes, sir. *Before May 27, 1950 I did."* (Italics ours.)

Then the witness explained the origin of the method employed to identify the lists, as follows:

"Q. Since you are familiar with all this, explain if the same person may have two '14.'

"A. No, sir, it can't be.

"Q. Why not?

"A. Because that collector puts the number '14' on all the pages. Once I was cheated. The collection was delivered to me without counting the number of pages. They sent 60 pages

---

[1] The way Mr. F. Fernández Cuyar handled the hearing and the whole proceeding has been up to his well-earned and solid prestige and his professional honesty. There is nothing in the record, however, that justifies Soto's imputation to Mr. Archilla Laugier that he made a poor defense of his trial.

and claimed a dollar prize. I went and looked for the collection and did not have it. I asked: Hoy many pages did the collection have? I claimed 60 and he claimed 61. As I had nothing to verify it I had to pay $500. Thereafter I decided that each collector would be identified by a number. It is the same with '14.' The pages had to be counted. Upon picking the collection, the pages had to be counted.

"Q. I want you to explain. If there were any other person acting as banker could it happen that two collections like this of number '14' which are supposed to belong to Roberto Andújar . . .

"A. Only one banker could have number '14.' If you collected and made delivery to me, you always delivered to me. The collector works with one banker alone."

The witness stated, in addition, that different numbers are written on the collection so that the name of the collectors remain unknown, and that one banker can not have two collectors with a "14" because the prizes get mixed up and mistakes are made when paying them.

Finally witness testified that Rivera Vizcarrondo "knew how they framed me and when he went to furnish bond for me he explained [what Sergeant Costas had said] to Mieres Calimano," but the coincidence as to the two groups of lists "was discovered after my trial."

The petitioners offered in evidence, in the course of the hearing, various documents, among them, a certified copy of the transcript of the evidence of the trial against Soto and Lake Penn as well as an affidavit from Luis Santos in support of a motion for a new trial.

*Luis V. Costas*, Sergeant of the Insular Police, and in charge of the squad against the vice, testified, when called by the district attorney, as follows:

"Q. Sergeant, do you remember where you were stationed and if in charge of any particular service on May 27, 1950?

"A. I was on duty in the metropolitan zone.

"Q. In charge of what?

"A. In charge of the squad against prostitution at that time.

"Q. Do you remember if on May 27, 1950 these two defend-

ants were arrested with other defendants in relation to the *bolita* game?

"A. Yes, sir, in different places.

"Q. Sergeant, do you remember if on May 27, 1950, you went to the office of the district attorney or to the district court in connection with these arrests?

"A. No, sir.

"Q. What day of the week was it?

"A. If I remember correctly it was Saturday.

"Q. Sergeant, do you know Ramón Rivera Vizcarrondo?

"A. I can't tell by the name.

"Q. Do you know this man?

"A. I have seen him before.

"Q. Did you speak to him on May 27, 1950 or on any other previous occasion with relation to *bolita* cases?

"A. I have never spoken a word to this man.

"Q. Did you bring any defendant to the district attorney's office on the 24th, 25th, or 26th arrested on *bolita* charges?

"A. No, sir.

"Q. Are you positively sure?

"A. Positively sure. At that time I worked only with the prostitution squad unless it were a case we took by surprise. But not now, now I have both squads.

"Q. That is all.

"DEFENSE: No question."

Judge Ramírez Pabón who presided the hearing of the motion seeking the annulment of the judgment entered an order setting aside the judgment as to both defendants on the ground that the same was obtained by fraud, stating the following:

". . . the court concludes that defendants are right in their allegation that the documentary and oral evidence that serves as a basis for the judgment imposed on them on June 30, 1950 was the result of a collusion to make it appear as if the number of lists introduced in evidence on June 30, 1950 had been seized in the possession of and in the car of defendant José Soto Zaragoza; having the court also reached the conclusion that those lists had been seized on the same night that defendants were arrested, in possession of other persons who were arrested that

same night for the same offense; the court stating likewise that said lists were fragmented or separated and after being thus fragmented or separated, a part thereof was introduced in defendant José Soto Żaragoza's car to make it appear afterwards at the hearing held at this Court on June 30, 1950 that they had been seized in said car. . . ."

The *Fiscal* of this Court, on appeal, alleges that the judge of the lower court committed manifest error in weighing the evidence. I believe it did so. And I shall explain.

This Court in its opinion—like the judge of the lower court—concedes great virtue to defendants' evidence taking as a basis for its findings, facts that arise from discredited testimony not only because of the personal interest of the witnesses, but also because of the manifest falsity that transpires therefrom. Although it is granted that "the principal witnesses of the defendants" "were obviously lying in parts of their testimony" it is pointed out that "the overriding consideration, which undoubtedly persuaded the lower court that the *boliteros* and not the detectives had told the truth *as to the principal facts in controversy*, was the documentary evidence."

It is my opinion that the documentary evidence in itself proves absolutely nothing. It is the oral evidence, the testimony of witnesses who "were obviously lying in parts of their testimony"—for which reason their statements should have seemed dubious by operation of law (§ 524, Code of Civil Procedure, 162 Law of Evidence; *People* v. *Nieves*, 57 P.R.R. 769, 784-5)—which serves as a ground tends to lend color to the allegation of fraud. This is the evidence that the judge of the lower court believed and which this Court accepts, even in its most inconceivable particulars, when it thrust upon a number of agents of the insular police the terrible anathema of *corrupt*. The finding that said agents executed a scheme to defraud the district court—being Sergeant Costas the ringleader of the conspiracy—is unwarranted.

The serious implications which may be derived from the opinion of the court require the most conscientious consideration and the most rational analysis of the facts involved herein. What interest could move Sergeant Costas, detective Castro and the other detectives to whom the fraud is attributed, to plan and execute the scheme of planting *bolita* lists in Soto Zaragoza's car? What superior evidence—and to what extent—did the judge who heard the motion to set aside the judgment as null, have before him in order to discard the evidence on which the Judge presiding the trial based his judgment of conviction?

I turn to examine in the first place the documentary evidence. It consisted of (1) a group of 37 lists of numbers of three digits followed by a dash and units to the right, which were the lists presented at the trial against Soto Zaragoza and Lake Penn. These 37 lists had on their back a "14" which looked like "17." (2) A group of 11 *bolita* lists which also had on their back a "14" which looked like a "17." These 11 lists were introduced as part of the documentary evidence at the trial against Francisco Vázquez Ortiz and Luis Muskus on July 13, 1950 (Luis Santos Lake had already pleaded guilty on the 6th of the instant.) (3) Two groups of lists marked on the back, one with a "6" and the other with the word "Río," which was part of the documentary evidence also introduced at said trial. (4) A list of "limited numbers" in a yellow paper which was introduced at the trial against Soto Zaragoza and Lake Penn and which Francisco Vázquez Ortiz identified as a list of "dream numbers," which was seized in his possession the night he was arrested together with Santos. It is unnecessary to refer to the rest of the documentary evidence.

As I said previously, the documentary evidence in itself proves nothing. The number "14" which looked like a "17" on the back of the 37 lists introduced at the Soto trial and the 11 lists introduced at the trial against Francisco Vázquez Ortiz and Muskus, was written by the same hand, as the dis-

trict attorney admitted at the hearing of the motion and previously at the Vázquez trial. But from that single fact it can not be inferred that both groups of lists are a part of the same collection, nor that, even if a part of the same collection, they were necessarily in Luis Santos's possession when he was arrested. Could it not be that those collections corresponded to different drawings? Or group of lists of the same collection picked up at different hours, or that delivery of the group found in Soto's possession had already been made to him?

The opinion of the majority is based on the assumption that "the lists introduced in evidence against Soto and Lake Penn were a part of the '14' collection which was picked up by Santos on the night of May 27 from the agent for the '14' collection." And this can not be assumed unless entire credit is given to Santos Lake's version that he collected for a so-called Roberto Andújar and not for Soto, and as to where, when, and how he picked up the collections made by the three agents identified with number "14", "6", and "Río." Is this witness who was obviously lying when he testified that he had never heard Soto Zaragoza mentioned as *bolitero* (although his brother Harry Lake Penn was Soto's chauffeur) and that he did not know any other *bolitero*, worthy of any credit?

How can it be explained—because in the record there is no rational explanation for it—that Santos Lake, who according to his testimony was present during "some parts" of the trial against José Soto Zaragoza on June 30, 1950, was able to learn or suspect from his seat in the audience, that the lists introduced at the trial were a part of the lists seized in his possession?

How—I repeat—if when detective Modesto Castro identified the lists at the Soto trial, he did not mention nor did the district attorney, nor any of the attorneys for the defense, nor even the Judge who presided the trial, any identification, mark, or number whatsoever on the back of said

lists that might give Luis Santos Lake any knowledge from what he heard, did he know that those lists had on the back a "14" which looked like a "17"? By what magic operation could Santos Lake suspect that the lists introduced against Santos and his brother Harry Lake were a part of the lists seized on him on May 27, 1950, if there is nothing in the record nor in his own testimony nor in the testimony of Mr. Jiménez Sicardó nor in any other testimony, showing that Santos Lake had even gone near the clerk's table during any recess of the court or at the end of the trial, or had gone to the office of the clerk and seen, even from a distance, the lists introduced against Soto?

Certainly it can not be said that Santos Lake, who was present "during the trial" of Soto according to his affidavit before Notary Archilla Laugier on July 5, 1950, and during "some parts" of said trial according to his testimony at the hearing of the motion, suspected that the lists introduced against Soto were a part of the lists seized on him because detective Modesto Castro, upon identifying one of the 37 lists introduced against Soto testified at the trial that the same started with the number 101 C. B. 15, explaining the meaning of the letters C. B. This point was neither mentioned by Santos Lake in his affidavit of July 5 before Notary Archilla Laugier nor communicated by him to Mr. Jiménez Sicardó until he went to his office when the motion to set aside the judgment as null which was filed on January 22, 1951 was set for hearing.

Strange coincidence! Besides a "14" which looked like a "17" with which the witness identified the lists that he carried with him when he was arrested, it was also number 101 C. B.–15 that Santos Lake stated that he had played with a *bolitero* named Pedrín Santiago who sold *bolita* for agent "14." The same number 101 C. B.–15 that detective Modesto Castro mentioned at the Soto and Harry Lake trial as heading one of the lists seized on them in Soto's car on May 27!

Why, did not Santos Lake tell Mr. Jiménez Sicardó when he went to ask him immediately after the Soto trial to find out whether the lists had a "14," that the lists introduced against Soto necessarily belonged to him because he had heard detective Modesto Castro identify one of them with the number 101 C. B.–15 that he had played with a *bolitero* of agent "14"? Why if said number was mentioned by detective Castro in the morning session at the Soto trial did he not communicate immediately to counsel for Soto and Lake Penn in order to aid in shedding some light on the facts of which his own brother was being prosecuted? Was not this his purpose in visiting Mr. Jiménez Sicardó after the trial, even though he did not know him? Why did Santos Lake delay more than six months—until after the motion to set aside the judgment as null was set on January 1951—in communicating to Mr. Jiménez Sicardó the particular detail about number 101 C. B.–15 which he played with a *bolitero* from agent "14"?

On the other hand, is it reasonable to think that Santos Lake spoke the truth when he testified that he did not collect *bolita* for Soto but for Andújar? Was not his brother, Harry Lake Penn, Soto's right-hand man? Why should Santos Lake try his luck in such an activity with a *bolitero* who is a competitor of Soto Zaragoza, when his brother has been working for 15 years with Soto? Is not the so-called Andújar a dummy behind which not only Santos Lake but also Soto Zaragoza shields himself? So it seems, for if we admit the fact that Santos Lake worked, like his brother, for Soto, the identification of the number "14" on the back of the lists introduced at the Soto trial and those seized on Santos himself would no longer have the importance attributed to said fact. The entire theory of fraud would collapse. And such, in my opinion, is what happened. Hereinafter I shall prove it, when I examine the testimony of Soto at the hearing of the motion to set aside the motion as null.

The other piece of evidence mentioned in the opinion of the Court in support of the theory of fraud is the list of limited numbers to which detective Modesto Castro referred at the Soto trial and which was found in the right pocket of his jacket when he was searched at the police station on the evening of May 27. This list was introduced in evidence against Soto and witness Francisco Vázquez Ortiz referred to it at the hearing of the motion—as well as at his own trial—as one of the lists included in the "dream book" and which had no relation whatsoever with the *bolita* game as such, having testified that said lists were seized in his possession when he was arrested together with Santos.

I do not see how the court can refer to this piece of documentary evidence as giving "some support" to the theory of fraud, unless entire credit is given to witness Vázquez Ortiz. His testimony, because of the fanciful and inconceivable facts alleged therein—which when elaborated do not conform to the rules that normally govern human behavior —carries with it the germ of falsehood and should not have deserved any credit from the lower court.

Is it logical to suppose that Costas, if he conceived the scheme to plant *bolita* lists in Soto's car, would do it so ingenuously as Vázquez says, that is, visible to him and everybody else? He can see everything from the bull pen: He sees that the *bolita* lists seized on Santos are scattered on Costa's desk. He sees when Costas takes a handful of those lists and comes out with them "in his closed fists." He sees the position assumed by Costas when he approaches Soto's car. He sees how Costas introduces his hand in the car. He sees that when he leaves he no longer has the lists in his hand. From the bull pen he is not only able to see Costas in his office taking the lists from the desk, but he also sees him planting them in the car, which he places directly in front of the door of the station.

Can it be possible that "a deliberately planned and carefully executed scheme" be carried out in such a careless way

as inferred by the testimony of Vázquez Ortiz? Because Costas knew that Vázquez, as well as Luis Santos Lake and Muskus were in the bull pen, arrested on a *bolita* charge. Why should we suppose, as is stated in the court's opinion, "that Costas was not aware that they could see him or were watching him," or "he might have thought that it would be only a question of his word against the word of the *boliteros?* Is it not precisely the irrational way in which the facts stated by this witness develop that must have induced the trial judge to reject his testimony, which in other aspects is vitiated of evident falsity? What does this witness do when he sees Costas plant the lists in Soto's car? Soto is arrested and locked up with him in the bull pen. Does he say anything to Soto? No. Does he say anything to Luis Santos Lake or to Muskus, who are together with him in the bull pen, of what he is seeing, so that they too may watch, or of what he has already seen? No. Does he say anything to anyone about it before Soto Zaragoza's trial? Nothing. He keeps it all to himself. It was for the first time, as he says, on October 11, 1950 while working as prisoner in the police station of San Juan that upon Mr. Jiménez Sicardó passing by, he told him what he had seen Costas do. However, Mr. Jiménez Sicardó testified that Vázquez had testified on this particular at his trial, held on July 13, 1950. It is obvious that Jiménez Sicardó, and not Vázquez, speaks the truth.

On the other hand, does not Vázquez say that after Costas walked away from Soto's car (without holding the lists in his hands) and when Quiñones came down to search the rear of the car, a violent discussion ensued between Soto, Lake Penn, and the detectives? Was not Vázquez hearing Soto's complaints that someone had planted the lists which Quiñones found in his car? What reasons did Vázquez have to conceal the facts he had just seen, without telling them to Soto that night when he was locked with him in the bull pen, nor on any other instance prior to Soto's trial, thereby

allowing Soto to be convicted on fraudulent evidence? Is it not reasonable—and most logical—to think that if Vázquez had really seen what he alleged he had seen Costas do, he would have revealed it at least to Soto when both were jailed that night?

Is not Vázquez the person who comes driving another *Cadillac*—which he said belonged to Francisco Carmona Ríos—along Ponce de León Avenue, towards San Juan, and who upon meeting Santos Lake and the latter asking him to take him to Barrio Obrero, consents willingly? Was it not Vázquez also who, without yet starting his trip to Barrio Obrero with Luis Santos in a *Cadillac* which was not his, agrees—also willingly—to take Muskus and six women to the Ponceño Club in that same automobile? Did Vázquez have so much authority to use freely the Cadillac which did not belong to him as to oblige his friends immediately?

Was not this witness the same who—according to his testimony had in his possession the yellow paper with printed numbers that he described as a "dream book" (which was introduced in evidence against Soto) but that according to Mr. Jiménez Sicardó made up a list of "limited numbers"? Does not the description made by Jiménez Sicardó of this list coincide with the one made by detective Castro at the Soto trial? Castro said that it was a list of numbers limited to $4—Jiménez Sicardó explaining that limited numbers are "those which have a limit as to the amount which can be wagered thereon by reasons of dreams, etc. For instance, the number of the license plate of the banker's car is limited because they bet heavily on it." Why if Castro testified that said list of limited numbers was seized on Soto at the station after his arrest must we accept Vázquez's testimony that the list was his and that it was seized on him and not on Soto? What other element of identity such as the one attributed to the rest of the *bolita* lists exists with relation to this list of limited numbers so that this piece of evidence may lend "some support" to the theory of fraud, unless

entire credit is given to Vázquez's version? And is such unlimited credibility warranted?

The documentary evidence, if isolated from the highly suspicious and evidently discredited oral evidence—which should have been examined "with caution" by the judge of the lower court knowing that he was not treading "on firm ground," *People* v. *Nieves, supra*—is not sufficient to support the serious imputation of fraud. The lower court believed the testimony in which the torch of falsehood burned by spontaneous combustion, destroying a judgment of conviction which was based on rational testimony to which the judge who presided the trial had given entire credit.

I can hardly share the Court's opinion in the analysis that it makes to the effect that "two other episodes of a negative character also tend to confirm the theory that a scheme to frame Soto was perpetrated. The detectives failed to seize the $1,937 in his possession; they also failed to arrest Lake Penn at the scene of the alleged crime."

Soto's wallet was examined by detective Modesto Castro, evidently to see if he found additional documents with relation to the *bolita* game. He did not find anything. Upon noticing the great amount of money that the wallet contained he returned it to Soto. I do not see how the seizure of money—$1,937—could have been justified by a detective, let alone a committing magistrate [2] or a district attorney in his investigation of this occurrence in view that Soto was arrested on the charge *of having bolita* lists *in his possession*, and not on the charge of *operating* a *bolita* bank, and that at first blush it could be seen—as I myself have observed from the evidence sent to this Court in its original form —that the amount of money marked on said lists hardly reached one hundred dollars. In fact, in the 37 lists seized on Soto only $61.49 appear as wagered. What apparent

[2] It must be remembered that a municipal judge was present the night of the occurrences at detective headquarters, and we have to suppose that he authorized or at least sanctioned, Castro's behavior.

relation could there be between the large amount of $1,937 and the scanty $61.49, when the arrest was on the charge of possessing *bolita* lists and the Act requires that—in order to seize the money found on the person who possessed the lists—a direct relation be established between the money and the lists, that is, that it should appear prima facie that the money is the proceeds of the game? If we delve into this argument it too could also be said that the detective ought to have seized the lottery tickets and the cases of whiskey found in Soto's car, because Soto could have bought them with the proceeds from the *bolita*.

As to the fact that Lake Penn was not arrested at the scene of the alleged crime, it suffices to say that detective Castro testified at the trial that Soto and Lake Penn—both— were arrested by him and detective Quiñones when caught with *bolita* lists in their hands. Harry Lake Penn left the station in a taxi taking with him the cases of whiskey which had been returned to him. He was not locked up in the bull pen. But, must we then conclude that it was an omission of the detective not to arrest Lake Penn, and wander into saying that his arrest several hours later obeyed to the fact that Costas realized that "his release was inconsistent with their trumped-up story that Soto and Lake Penn had been handling *bolita* material together"? Why should we attribute to Costas, as ringleader of the conspiracy, the omission —because his mind was focused so intensely on the scheme to frame Soto—of "two obvious steps he should have taken to avoid the charge that the evidence against Soto had been contrived"?

Why should we think that it was an omission to release Lake Penn when it could have been a step with a view to discovering and arresting other persons that might be at Soto's service in his machinery of the game, since Lake Penn necessarily—as Soto's right-hand man—would communicate with those persons on the very eve of the drawing just as

the last steps were being taken in the preparation of the machinery of the game for the drawing on the following day?

It is likewise inconceivable that Costas, two or three days before Soto's arrest, in the district attorney's office, San Juan Section, in the presence of witness Rivera Vizcarrondo and some *boliteros* whom he arrested, should state that he was going "to catch Chichí with or without a collection." It is not reasonable to believe that Costas would publicly announce such a vile purpose.

However, in spite of the fact that Soto knows through Rivera Vizcarrondo what Costas said, he goes *without* a collection to see why Luis Santos Lake was arrested, in order to bail him. Why, then, does he park his *Cadillac* behind a commercial wagon, in front of the entrance to Pier No. 12 —according to Costas and Quiñones' testimony at the trial— at a distance of "about 400 feet" as Quiñones testifies? Is that the innocent act that Soto Zaragoza pretends to insinuate from the witness stand the day of the hearing of the motion, when he exclaimed: "How could I go in front of the station with *bolita* lists!"? Far from that, because of the situation of detective headquarters and the distance from there to Pier No. 12, as well as because of the location of Soto's car—shielded behind a commercial wagon—it is logical to conclude that Soto, experienced in the methods of deceiving police vigilance while running his illegal *bolita* business, parked at a safe distance from the station, covered by the commercial wagon—like one who goes stealthily or stoops so as not to be seen—to examine the *bolita* lists while he sent a third party to the station to find out what was the matter with Santos Lake. Why if Soto and Lake Penn were going *to bail* Santos did they not go personally to the station? Why should it be difficult to believe that Soto parked in the place and in the manner testified by Castro and Quiñones, only a few hours before next day's drawing, and proceeded—in order to gain time or perhaps to see the condition of his business in view of the unexpected arrest

of Santos Lake—to examine *bolita* lists with his chauffeur, trusting in not being seen?

Judge Torres Aguiar, who presided the trial, did not believe the defense's version in the sense that Soto's car was parked only 8 or 10 feet from the station. Like he, I am convinced that what Castro testified, and was ratified under extraordinary circumstances, —which I shall mention hereinafter—by Quiñones' testimony as to the situation or parking of the car, and to which Judge Torres Aguiar gave entire credit, is the truth.

As it may be seen from the summary of the evidence, on the day of the trial Quiñones testified differently from what he had previously told to the district attorney. And it is apparent that the particulars which he changed in his testimony were essential particulars. It is evident that Quiñones on the day of the trial was not correcting "errors" or explaining "mistakes" in his previous testimony. His testimony on that day was completely opposed to what he had testified before the district attorney, as to fundamental facts.

What reasons did Quiñones have to alter his testimony? There is nothing in the record from which a satisfactory explanation may be drawn. However, a fact does stand out clearly and obviously, and that is that after Quiñones testified before the district attorney on the day after the events took place, substantially in identical manner as Castro, he did not bother to go—from May 28 until June 30—to the district attorney and tell him the nature of the "errors" or "mistakes" appearing in his testimony, nor to justify or explain the reasons that led him to commit those "errors" or "mistakes."

Quiñones was a public officer and as a member of the detective force we must assume that he had knowledge of what it meant to change his testimony at the trial, taking the district attorney by surprise. He knew that only he and Castro could testify as to the manner they seized the lists

in Soto's car. Why, then, wait until the day of the trial to give the surprise from the witness stand? It is significant that while he failed to communicate with the district attorney to point out the "errors" or "mistakes" contained in his previous testimony, evidently he communicated with Soto, for remember the statement of counsel for the defense at the trial when, referring to Quiñones and before the latter took the witness stand, he announced: "This witness [witness for the prosecution] is going to tell the truth," and upon the district attorney asking him if he knew it, he answered "I know it."

What induced Quiñones to remain silent before the district attorney while he communicated with the defendant? What induced him to give the surprise on the day of the trial by changing his testimony in such a way as to tear to pieces the district attorney's case? The reasons adduced by Quiñones—family misfortunes, according to his own words from the summary of the evidence—could not create a mental picture of mere fantasies which moved him to testify the day after Soto's arrest, facts fundamentally different from those he testified at the trial.

Contrary to Quiñones, Castro did not alter his testimony and apparently, without knowing that Quiñones would correct the "errors" or "mistakes" of his statement to the district attorney at the trial, he testified that Soto had asked him the night of the arrest "to help him in this case and to see him at his house afterwards."

In labeling the conduct attributed to Costas as "corrupt" and "foolhardy" the majority affirms that "it is significant that Costas never denied the story that he planted *bolita* lists in Soto's car, in spite of the fact that he took the stand to deny the comparatively trivial charge that he once threatened to arrest Soto 'with or without' a collection." The implications drawn from said affirmation about Costas' conduct are not justified.

Costas was summoned at the request of the district attorney when witness Rivera Vizcarrondo accused Costas of having stated that he would arrest Soto with or without collection. He took the witness stand the next day and was examined by the district attorney on that particular. He was not cross-examined. Costas, who was not in charge of the case of the People, did not need to deny the accusation that he had planted the lists in Soto's car because he was not examined on that particular. Evidently it never occurred to the district attorney that the court would believe the incredible version of witness Vázquez Ortiz' that he had seen Costas plant *bolita* lists in Soto's car. And as the court had the stenographic record containing the evidence adduced against Soto at his trial in which he was convicted, he had nothing else to add.

The defense of the defendant at the trial was a "favorite, although usually false, defense" to the effect that they had nothing in their hands when the detectives approached, and that somebody surely planted the *bolita* lists that Quiñones had found in the rear seat of the car. But the truth is that neither witness Ramón Pérez Méndez nor the defendant himself, Harry Lake Penn, stated at the trial—as did Soto at the hearing of the motion— that Costas had leaned on Soto's car. Nor did Soto take the witness stand [3] to say it, nor to say that Rivera Vizcarrondo had warned him about Costas, nor did Rivera Vizcarrondo come to say it at the trial in spite of the fact that when the latter went "to bail him" according to Soto, he explained it to the district attorney. It is at the hearing of the motion that Soto takes the witness stand to place Costas as leaning on his car, stating that he gave this fact no importance because the car had already been searched and they had found nothing.

Is it reasonable to believe that Soto, warned beforehand by Rivera Vizcarrondo of Costas' threat to catch him "with

---

[3] See *Raffel* v. *United States*, 271 U. S. 494, 70 L. Ed. 1054.

or without a collection," would give no importance to the fact that Costas leaned on his car—if not at the very moment that Costas leaned—at least when Quiñones finds, according to Soto, the *bolita* lists in the rear seat of the car, on the same side where Costas leaned? It should be borne in mind that the only two persons who testified that they had seen Costas leaning on the car are Francisco Vázquez Ortiz, the witness who saw everything and Soto himself. This happened at the hearing of the motion.

Why did Soto, when detective Quiñones found the *bolita* lists in his car and exclaimed "Don't look any more, here it is," rebuke Quiñones telling him "Look you bandit, how can you say that is here? You put that here yourself?" Why did he not blame Costas at the very moment as being the one who planted the lists there? Had not he just seen Costas leaning on the rear door of the car with his right arm inside the car, on the same side in which Quiñones found the *bolita* lists? Had not Rivera Vizcarrondo already warned him? Had not the car been searched before Costas went near it and nothing had been found?

Although Soto testified at the hearing of the motion that he withdrew from the *bolita* business on May 3, 1949 because "detective Virella framed me," when asked if prior to the night he went to the station to bail Harry Lake's brother he was in the *bolita* business he answered "Yes, sir, before May 27, 1950 I did." Does not Soto contradict himself with this admission?

The excuse that Soto gives for fixing May 3, 1949 as the date in which *he retired* from the *bolita* business was that detective Virella had "framed him." The absurdity of using such a term is apparent from a mere reading of *People* v. *Soto, supra.* There it states that Soto was arrested together with Lake Penn and a so-called Santana. The latter, according to detective Virella, had in his hands, among other papers, a list of *bolita* numbers and was leaning on Soto's car, speaking with Soto, who upon seeing Virella said "Look

at Virella," and Santana tried to destroy the lists placing the other papers in his pocket. We held that since the material held by Santana in his hands was not *bolita* material, as decided by the lower court, Soto's arrest did not lie, and therefore, his search was illegal. The facts eloquently indicate the inadequate use of the term "frame up" employed by Soto especially in view of the fact that when he was searched at the station they found on him a small paper with two *bolita* numbers. Evidently Soto uses the term "frame up" with any intervention of the police in his affairs.

The truth is that Soto had admitted, in the manner already stated, that before May 27, 1950 (in which he was arrested for the violation of which he was convicted in the instant case) he was in the *bolita* business. But there is also another admission of Soto which is of the utmost importance. It is related with collector No. "14." The testimony of Soto —which is transcribed as to this particular in the summary of evidence—contains his confession that agent "14" collected for him. It is precisely because Soto is not categorically asserting that agent "14" collected for him—which could not be expected of him—that his words become truly important. Soto is explaining that once when he was a banker they "cheated" him. They delivered the collection to him without counting the number of pages. They claimed a dollar prize from a collection of 60 pages. He looked for the page in which the prize number might appear, but did not find it. He asked the collector how many pages the collection had, the latter claiming 61 while Soto claimed 60. As he had no proof he had to pay $500. "Thereafter I decided that each collector would be identified with a number. It is the same with '14.' The pages had to be counted." Upon picking the collection the pages had to be counted.

Was not Soto, the banker, *swindled* by his agents or collectors and forced to pay a $500 prize, and because of this experience he required each collector to be identified with a number? Does he not immediately say that "It is the

same with 14" and that "upon picking the collection the pages had to be counted"? If Soto is attacking the judgment of conviction and has testified that a collector only works for one banker, why upon referring to "14" does he connect it with the preventive measure he adopted in his *bolita* business after he was "cheated" and says that "it is the same with 14" and that upon picking the collection the pages had to be counted? Is he not speaking of his own experiences in the *bolita* business? For what banker did agent "14" work if not for Soto himself? It is the truth that comes out without wanting to say it. That is why I previously stated that said Andújar was just a dummy behind whom Santos Lake, as well as Soto Zaragoza, shielded themselves.

Since Soto has practically admitted, as I have set forth, that collector "14" worked for him and a part of collection "14" having been found on Santos Lake, it is not difficult to conclude that no fraud whatsoever was committed nor that the lists were planted in Soto's car. Should we accept as good the testimony of *boliteros* who have confessed and been convicted, as to the established practices in their activities in the *bolita* business, which activities because they are their exclusive patrimony and are under their sole control, may be elastically adjusted in furtherance of their own purposes? Is it not more reasonable to believe that Santos Lake had already collected and delivered to Soto the 37 lists from collection "14" on his first round, and that after collecting the rest of the lists in another visit to agent "14," as well as the lists from the "6" and the "*Río*" collections, he was caught and arrested by the detective? Soto's own testimony supports such assertion, for while Santos brings the collection from "6," "14" and "*Río*" corresponding to Loíza Street and Barrio Obrero, before delivering it to his banker, he, stops Vázquez and asks him to take him to Barrio Obrero, and before going there he is arrested. Why go back to Barrio Obrero if he has just come from there? To whom is

Santos going to deliver the collection which he has brought from Loíza Street and Barrio Obrero? Is he perhaps going to make another round in search of more collections?

It is significant that Santos, Vázquez, and Muskus were arrested in Cerra Street at Stop 15. Is not Stop 15, Monserrate Street, where Soto is also found when witness Ramón Pérez Méndez receives a call asking him to tell Harry Lake that his brother has been arrested? Is not Stop 15 also where Harry Lake is subsequently arrested while speaking with "the boys"? Is it not revealed by the evidence that Soto has property at Stop 15?

Finally, was not it logical to expect Soto, who knew Santos had already been arrested—on the eve of the drawing—to take advantage of the slightest opportunity to go over the partial collection that he had received from Santos and hasten to bail him in order to determine what part of the collections picked up by him were seized on him?

Here ends my analysis of the evidence. It is evident, in my opinion, that the judge of the lower court committed error in weighing the evidence. I reach these conclusions "without speculations and without forcing implications not necessarily supported by said evidence"; complying with my duty of conscience in dissenting from the opinion of the Court and with due respect to my colleagues who, as well as the trial judge, have fully complied with their duty.

Just as this Court has done in other cases, *Adm. Bd. of Pier etc.* v. *P. R. Am. Sugar Refinery*, 70 P.R.R. 338; *Torres* v. *Vélez*, 49 P.R.R. 712; *Maldonado* v. *Porto Rico Drug*, 31 P.R.R. 709, it is my opinion that the decision appealed from should be reversed because of the error assigned. The rule that we shall not interfere with the weighing of the evidence made by lower court unless it is shown that manifest error was committed, is not, because it is an accepted and well-settled rule, relentless or inflexible. Precisely, to reach the conclusion that a lower court committed manifest error in

its weighing of the evidence, this Court must comb the record by means of a mental process of rationalization which finds its inevitable origin in the rules that govern human behavior. It has to be so, for we do not see or hear the witnesses testify, nor are we able to appreciate their gestures or attitude. Otherwise, an appellate court could never reverse a judgment on that ground.

Going, however, even farther and without need of quoting any authority—because the situation in this case is clear and evident—I believe that the evidence herein should be weighed by such standards as have already been established by this Court in previous similar situations. The judge who heard the motion, who was not the one who presided at the trial, had before him not only the witnesses who testified in said hearing, but also the stenographic record of the testimony of the witnesses at the trial. Said stenographic record must have necessarily been examined and considered by the lower judge together with the testimony of the witnesses who testified before him. As regards this record, indispensable in deciding this case, this Court is in the same position as the lower court to make its own findings of fact. *Encarnación* v. *Salim*, 69 P.R.R. 715; *Nogueras* v. *Muñoz*, 67 P.R.R. 413; *Gómez* v. *Trujillo*, 59 P.R.R. 470.

At this point I want to make clear that it is not my opinion that the judge of the lower court was bound to totally reject the testimony of witnesses who made partly false statements. Previously I quoted § 524 of the Code of Civil Procedure (162 Law of Evidence, and *People* v. *Nieves*, *supra*) being aware in all its significance of the interpretation given by this Court to said provision in that case. I did it precisely to illustrate the caution with which the judge of the lower court should have received the evidence in support of the theory of fraud. And as a further reason to indicate why his weighing of the evidence was manifestly erroneous.

128

For the reasons stated, it is my opinion that the order which set aside the judgment sentencing Soto Zaragoza and Lake Penn to two years and one year in jail, respectively, should be reversed and said judgment should be left in full force and effect.